**TEXARKANA MEMORIAL HOSPITAL, INC., d/b/a Wadley Regional Medical Center, Appellant,**

v.

**Kathy MURDOCK, Individually, and Sheryl Burgess, as Administratrix of the Estate of Jessie Taylor Andrew Burgess, Deceased, and the Arkansas Department of Human Services, Division of Economic and Medical Services, Appellees.**

No. 06–94–00099–CV.

Court of Appeals of Texas, Texarkana.

July 25, 1995.

Rehearings Overruled July 25 and Sept. 6, 1995.

John R. Mercy, Atchley, Russell, Waldrop, Texarkana, for appellant.

Grant Kaiser, Onstad, Kaiser & Fontaine, Houston, Mark Lesher, Lesher & Cochran, Texarkana, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

Texarkana Memorial Hospital (Wadley) appeals a judgment of negligence in favor of the plaintiff Kathy Murdock, the estate of Jessie Burgess, and the Arkansas Department of Human Services. Wadley contends that the trial court erred (1) in entering a judgment in favor of the Arkansas Department of Human Services (ADHS) for $352,-784 with interest, because ADHS's claim was only derivative to that of Murdock, (2) in entering a judgment for Murdock because there was no evidence, or insufficient evidence, of negligence, and (3) in entering a judgment for the ADHS for $352,784 and interest, because there was no evidence, or insufficient evidence, of a causal link between any injuries caused by negligence of the defendant and the amount of medical expenses awarded. Murdock cross-claims that the trial court erred in disregarding the jury finding that Murdock recover for the medical expenses of Jessie Burgess caused by the negligence of Wadley,

Murdock entered Wadley Hospital on January 21, 1991, ready to give birth. She was placed in a labor room attended by Dr. Thomas Wilson. Wilson was aware that Murdock had previously given birth to a baby with severe congenital birth defects and that tests had indicated similar problems with this pregnancy. As predicted by the doctors during Murdock's pregnancy, Murdock's baby, Jessie Burgess, was born with severe congenital birth defects. Burgess also had meconium [1] in his mouth. Dr. Clark Green attempted to suction the meconium from the baby's throat eight to ten minutes after birth. Jessie Burgess experienced medical problems until his death in March of 1992.

Murdock sued Wadley, claiming the hospital was negligent because it failed to have a policy providing that laboring mothers be taken to the delivery room and because it did not provide timely attendance of all personnel necessary to deliver the baby. ADHS filed a petition in intervention because it had paid a portion of Murdock's medical bills, and in return Murdock had assigned it any right to collect for these expenses from any third parties. The jury found (1) that Wadley was

---

1. In approximately ten percent of births, the fetus has a bowel movement in utero. Meconium is the contents of a fetus's bowel movement.

negligent and that its negligence was a proximate cause of injury to Jessie Burgess, (2) that $250,000 would reasonably compensate the estate of Jessie Burgess for his damages, and (3) that $500,000 would reasonably compensate Murdock for Jessie Burgess's medical expenses. The trial court entered judgment for the estate of Jessie Burgess in the amount of $250,000 for his damages. The trial court also entered a take-nothing judgment for Murdock for medical expenses and awarded the amount of $352,784 in favor of ADHS for medical expenses.

## ADHS's RECOVERY AS AN ASSIGNEE

By Wadley's first point of error, it contends that the trial court erred in entering a judgment in favor of ADHS in the amount of $352,784. The parties dispute in what form rights were assigned to ADHS. Both parties base their arguments on an Arkansas Code provision that provides the assignment of Murdock's cause of action. The Arkansas statute provides that:

> (a) As a condition of eligibility, every Medicaid applicant shall automatically assign his or her right to any settlement, judgment, or award which may be obtained against any third party to the Arkansas Department of Human Services *to the full extent of any amount which may be paid* by Medicaid for the benefit of the applicant.

> (b) The applicant for Medicaid benefits shall, in itself, constitute an assignment by operation of law.

> (c) The assignment shall be considered a statutory lien on any settlement, judgment, or award received by the recipient from a third party.

ARK.CODE ANN. § 20–77–307 (Michie 1993) (emphasis added).

Wadley argues that the statute only provides for assignment once a judgment is obtained and cannot, therefore, be the basis of a judgment against Wadley. There is no restriction in the statute that the assignment cannot take effect prior to judgment. The language in this statute creates a right to a settlement or judgment in favor of ADHS rather than just the right to attach an already existing judgment. This point of error is overruled.

Next, we must decide whether a take-nothing judgment against Murdock for medical expenses defeats ADHS's right to collect those expenses. Wadley asks this Court to consider *Coppock & Teltschik v. Mayor, Day & Caldwell,* in which the court stated that an assignee can only assert whatever rights the assignor had. 857 S.W.2d 631 (Tex.App.—Houston [1st Dist.] 1993, n.w.h.). Wadley concludes that ADHS's claim was derivative to that of Murdock, and, therefore, because the court found Murdock was not entitled to receive any part of the $500,000 found by the jury in medical expenses, ADHS had nothing to be assigned to it.

One to whom a cause of action is assigned **after suit is brought** takes it subject to final adjudication between the original litigants and is bound by the judgment rendered. *Matthews v. Boydstun,* 31 S.W. 814 (Tex.Civ.App.—Dallas 1895, writ ref'd). Similarly, the plaintiff could bring the suit for his own use and benefit insofar as his nontransferred interest still subsisted and for the use and benefit of his transferee insofar as the interest in the cause of action had been transferred. *Fort Worth & Denver Ry. Co. v. Ferguson,* 261 S.W.2d 874, 880 (Tex. Civ.App.—Fort Worth 1953, writ dism'd). The rights of the person who was plaintiff at the time of commencement of the suit are ordinarily in issue, and a recovery by him inures to the benefit of the transferee to the extent of plaintiff's interest. *Hearne v. Erhard,* 33 Tex. 60 (1870). The assignee depends directly on the assignor's recovery.

In the case at bar, however, the assignment was not made after suit was brought, and the plaintiff did not bring the suit alone. Both the assignor, Murdock, and the assignee, ADHS, were parties to the suit. When both the assignor and the assignee sue, the procedure actually constitutes the prosecution of a single cause of action, the only difference being that the proceeds of a judgment secured from the defendant are not necessarily given directly or solely to the person who had original title to the cause of action. *Ferguson,* 261 S.W.2d 874. When a

plaintiff transfers only a part of a cause of action, the plaintiff can sue for his own use and benefit as his interest might appear, with the assignee suing **in its own name** for its own use and benefit as its interest might appear, both prosecuting their separate claims (though founded on the same cause of action) in the same suit. *Ferguson,* 261 S.W.2d at 880.

■ This case involves the settling of two controversies. Murdock sued Wadley and ADHS intervened. Intervention, like other rules of party joinder, finds support in the desire to avoid a multiplicity of actions in settling the controversies between various parties arising out of a single source of friction. 1 ROY W. MCDONALD, TEXAS CIVIL PRACTICE § 5.78 (rev. 1992). The final judgment must dispose of all parties, including intervenors. 1 ROY W. MCDONALD, TEXAS CIVIL PRACTICE § 5.81 (rev. 1992). The right to intervene is given in furtherance of a speedy disposition of suits and to prevent multiplicity of actions. *St. Paul Ins. Co. v. Rahn,* 586 S.W.2d 701 (Tex.Civ.App.—Corpus Christi 1979, no writ).

ADHS can sue Wadley in its own name. This judgment settled two issues at once and fulfilled the purpose of a suit in intervention. This point of error is overruled.

■ By her sole cross-point, Murdock contends that the trial court erred in granting Wadley's motion to disregard the jury finding that Murdock recover for the medical expenses of Jessie Burgess caused by the negligence of Wadley. The jury made a determination that Kathy Murdock was entitled to $500,000 for the medical expenses which were incurred because of Wadley's negligence. The trial court, however, had a right to award this recovery to ADHS, because of the assignment.

■ Where all evidence is documentary, questions concerning construction and effect of an assignment are for the court. *Wood v. Gulf, C. & S.F. Ry. Co.,* 15 Tex.Civ.

App. 322, 40 S.W. 24 (Dallas 1897, no writ). An assignment divests the assignor of the legal title to the cause of action; thus, he cannot maintain suit. *Winn v. Ft. Worth & R.G. Ry. Co.,* 12 Tex.Civ.App. 198, 33 S.W. 593 (Austin 1896, no writ). The assignee acquires the right to demand payment. *See River Consulting, Inc. v. Sullivan,* 848 S.W.2d 165 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

In the present case, Murdock assigned her right to collect medical expenses to ADHS "to the full extent of any amount which may be paid by Medicaid." According to the evidence, the Medicaid payment was in the amount of $352,784. Murdock may not also collect these expenses and force Wadley to pay double damages. Murdock cites the case of *City of Fort Worth v. Barlow,* 313 S.W.2d 906 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n.r.e.). This case, however, holds that the tortfeasor was liable to the intervenor, not the plaintiff, for the value of the past services rendered because an assignment had been made to the intervenor, the Veterans Administration.

To the extent that Murdock had assigned her right to collect the medical expenses to ADHS, being in the amount paid by Medicaid, then the trial court correctly ruled that ADHS was entitled to this amount, $352,784, and that Murdock was not entitled to this amount.

■ The assignment, however, applied only to any amount which was paid by Medicaid.[2] Thus, the $352,784 did not cover the entire jury award of $500,000. Apparently on the basis of the motion for judgment non obstante veredicto, the trial court determined in its judgment that Kathy Murdock was not entitled to receive any part of the $500,000 found by the jury as reasonable and necessary medical expenses. In order for a trial court to render a j.n.o.v., there must be no evidence of probative force upon which the jury could have made the findings relied upon. *Harbin v. Seale,* 461 S.W.2d 591 (Tex.

2. Section E of the Contract to Participate in the Arkansas Medical Assistance Program states that the hospital agrees:

To accept payment from Medicaid as payment in full for a covered service, and to make no

additional charges to the patient or accept any additional payment from the patient for that service which is covered under the Medicaid Program.

1970). The parties stipulated that the expenses introduced into evidence were reasonable and necessary for the treatment given the child at the Arkansas Children's Hospital.[3] As we have discussed earlier, there is evidence of proximate cause. Wadley contends a j.n.o.v. reducing medical expenses recovery by $147,216 was, in effect, granted by the trial court because Murdock was not personally liable. If, however, ADHS had not paid the expenses, she would be liable for all necessary medical expenses incurred by her child. *See* TEX.FAM.CODE ANN. § 4.02 (Vernon 1993); *see also* Op.Tex.Att'y Gen. No. JM–580 (1986). The only reason remaining why Murdock was not given the remainder after the payment of the $352,784 was because the payments were not actually made by Murdock, and all the payments that were made came from a collateral source.

▬ The theory behind the collateral source rule is that a wrongdoer should not have the benefit of insurance independently procured by the injured party and to which the wrongdoer was not privy. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931 (Tex.1980), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). This general rule has been extended to general fringe benefits received by the plaintiff, *see McLemore v. Broussard*, 670 S.W.2d 301 (Tex.Civ.App.—Houston [1st Dist.] 1983, no writ), and to services which are gratuitously given, *see Oil Country Haulers v. Griffin*, 668 S.W.2d 903 (Tex.App.—Houston [14th Dist.] 1984, no writ), and *City of Fort Worth v. Barlow*, 313 S.W.2d 906. The application of the collateral source rule depends less upon the source of funds than upon the character of the benefits received. *Lee–Wright, Inc. v. Hall*, 840 S.W.2d 572 (Tex.App.—Houston [1st Dist.] 1992, no writ). Medical insurance, disability insurance, and other forms of protection purchased by the plaintiff, as well as gifts the plaintiff receives, are easily identifiable as independent sources of income that are subject to the collateral

source rule. *Id.* In *Hall v. Birchfield*, this Court found that future damages were not subject to reduction on the ground that the services were available from the State free of charge. 718 S.W.2d 313 (Tex.App.—Texarkana 1986), *rev'd on other grounds*, 747 S.W.2d 361 (Tex.1987). However, in that case this Court noted such a reduction would preclude the plaintiff's right to seek medical care elsewhere and neglected the possibility that the government program would not be in existence in the future or available to this plaintiff.

In the present case, ADHS paid the $352,-784 in satisfaction of all the medical expenses incurred by Jessie Burgess. This was not to say that the amounts stipulated were not reasonable and necessary expenses, but ADHS was in a bargaining position by which it was able to obtain a reduction of this amount. The tortfeasor, however, has no right to get the benefit of a bargain made by ADHS. The reduction of the medical bill, which was negotiated by ADHS, was a collateral source and should not benefit Wadley. Therefore, Murdock would be entitled to the $147,216 not assigned to ADHS, being the balance of the amount found by the jury.

## EVIDENCE OF NEGLIGENCE

In its next point of error, Wadley contends that the trial court erred in entering a judgment for Murdock because there was no evidence, or insufficient evidence, of negligence.

▬ When both no evidence and insufficient evidence points are raised, the court of appeals should rule upon the no evidence point first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). In reviewing a no evidence point, a court must consider the evidence and inferences in a light tending to support the finding and disregard all contrary evidence and inferences. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992). A no evidence point will only

---

3. The following is a excerpt from the written stipulation between the parties:

It is further stipulated and agreed that the hospital, medical and other therapeutic care, services, supplies, equipment, and related items evidenced by the statements of charges

issued by Arkansas Children's Hospital and Wadley Regional Medical Center were necessary for the care and treatment of Jessie Burgess and that the costs thereof as evidenced thereby were reasonable at the relevant time and place.

be sustained if there is a complete absence of, or no more than a scintilla of, evidence to support the trial court's finding. *Freeman v. Texas Compensation Ins. Co.*, 603 S.W.2d 186, 191 (Tex.1980).

■■■ In reviewing a factual sufficiency challenge, we consider all the evidence in the record, including any evidence contrary to the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). A factual sufficiency point will only be sustained if the evidence is so weak as to render the finding unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

■■■ To prove negligence, Murdock was required to prove that the hospital caused damages by failing to exercise ordinary care. Ordinary care is that degree of care that a hospital of ordinary prudence would have exercised under the same or similar circumstances. *Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361 (Tex.1987).

■■■ By her pleadings, Murdock contends that the hospital was aware that the unborn child has passed meconium in utero, that the hospital knew or should have known that delivery was imminent, that the hospital should have moved her to the delivery room, that the hospital should have made available all necessary instruments and devices to suction the nasopharynx of the baby before his shoulders were delivered, and that a pediatrician adept and trained in resuscitation should have been present at delivery. She pleaded that none of these things were done and that the baby was delivered in the labor room, where there was no suctioning devices available, and that the baby was transferred to the nursery without any prior suctioning of his nasopharynx. She further pleaded that the nurse attending the nursery bagged and forced oxygen into the lungs of the baby prior to suctioning, forcing the meconium into the lungs and bronchial tubes.

Dr. Michael Cardwell was asked whether the baby had his nose, mouth, and throat suctioned out before the shoulders were delivered. He answered that the procedures were not performed in the Burgess delivery. There was testimony from Dr. Cardwell and nurse Gail Spicer that the reason it is critical to remove the meconium from the baby's nostrils and throat while the chest is still constricted inside the birth canal is to prevent the child from sucking the meconium into the lungs when the baby starts breathing. Dr. Cardwell further testified that the failure to perform these procedures was below the standard of care for a hospital.[4] He testified that the mother should have been moved to the delivery room when she was nine centimeters, that the pediatrician and obstetrician should have been summoned, that preparation should have been made in anticipation of a meconium staining of the baby, and that all the instruments and personnel should have been present. He concluded that if this had been done, the meconium aspiration syndrome and sequelae would have been prevented. When asked who was responsible for failure to perform the proper procedures, the doctor answered that it was a joint responsibility of the hospital, the nurses, and the physician who attended the delivery.

Considered in a light tending to support the jury's finding and disregarding all contrary evidence and inferences, we find that this was some evidence to support the jury's finding on negligence.

In reviewing the factual sufficiency challenge, we are required to review all of the evidence in addition to the above-mentioned evidence. Wadley responded with the testimony of three doctors: Dr. James Tanner, a

---

4. A In my opinion, the conduct of Wadley Regional Medical Center, through its employees, is beyond—underneath the standard of care established for an institution providing care to a patient such as Kathy Murdock.

Q Do you have an opinion, based upon your education, training and experience, that you hold with a reasonable degree of medical certainty as to whether or not any of the conduct of any of the labor and delivery nurses, in providing professional nursing services to Kathy Murdock and her unborn baby on January 21, 1991, amounted to negligence?

A Yes, I have an opinion.

Q What is your opinion?

A In my opinion, the nurses of Wadley Regional Medical Center attending to Kathy Murdock fell beyond or beneath the standard of care required in treating a patient such as Kathy Murdock.

board certified pediatrician, testified that the delivery of Burgess was so precipitous that there was not time to get the mother to the delivery room. Dr. Thomas Wilson testified that the necessary equipment for suctioning meconium was available. Dr. Clark Green testified that he suctioned meconium from below the larynx within eight to ten minutes after birth.

Gail Spicer, R.N., testified as to the accuracy of the hospital chart pertaining to Kathy Murdock. That at 2:00 a.m., Murdock was instructed to call when she had an urge to push, that at 2:27 a.m., the patient had a need to push and the cervix was at nine centimeters. At 3:00 a.m., a sterile vaginal exam was performed and the notes indicate that the cervix was complete and the patient was instructed to start pushing. At 3:05 a.m., the patient continued to push and stated that she could not stop pushing. At 3:05 a.m., the baby was delivered and immediately taken to the nursery. She testified that the general procedure is to notify the physician when the patient has an urge to push and a vaginal exam shows the patient to be complete. There was no showing on the chart that the doctor was notified when the mother began to push. This nurse made all the entries on the chart that were made at the time of birth. The attending nurses, Spicer and Turner, could not remember whether a suctioning device was available or absent in the labor room.

Melanie Roberts, R.N., called by Murdock, testified that it would not be extraordinary to leave a mother in the labor room until she was completely dilated and that it would not necessarily mean that the nurse was negligent. She testified that a Delee suction device was present in the labor room. Roberts also testified that she was familiar with the standard of practice and standard of care expected of labor and delivery nurses at Wadley, that she believed that they did not take Murdock to delivery in time, and that they did not have the necessary equipment available. She testified that a registered professional nurse would have known that the meconium was a risk factor because if it was inhaled or aspirated, it would cause lung problems; therefore, the goal was to suction at delivery.

Barbara Turner, R.N., testified that she instructed the patient to push and then went to the nurses' station to call Dr. Wilson. She testified that she did not recall whether anyone was left with the patient. Turner testified that she knew from her nurse's training that when a baby passed meconium before being born that it can create an emergency at the time of delivery. She also testified that it was the nurse's job to notify the physician, to ready all necessary equipment, and to get the patient to the delivery room.

Phyllis Burroughs, R.N., testified that when she received the baby at the nursery, she put a bag and mask over the baby's face and started forcing air down the baby's throat. She testified that this could have had the effect of forcing the meconium down farther into the lungs and that the proper sequence of events should have been to clear the meconium from the baby's throat before forcing oxygen down the baby's throat.

Dr. Michael Cardwell testified that the nurses failed to adhere to the standard of care required of the situation by allowing a multiparous patient to push in the labor room, by failing to timely notify the attending obstetrician, and by failing to provide the necessary equipment when they knew that there was meconium-stained fluid. The labor and delivery summary indicates that Murdock's water broke (membranes ruptured) at 11:03 p.m. This record also shows that the fluid was stained with meconium. This was more than four hours before the delivery and gave the hospital notice to prepare to avoid meconium aspiration at the time of the delivery.

The evidence does not conflict in regard to Dr. Cardwell's testimony that the baby's nose, mouth, and throat should have been suctioned out before the shoulders were delivered. The only testimony offered by the hospital about when the baby was suctioned was that it occurred in the nursery within eight to ten minutes after birth. The plaintiff offered testimony that the baby's problems and death were the result of brain damage when the baby was not getting oxygen for a six minute period. There was

conflicting testimony about when the mother should have been moved to the delivery room and if there was a suction device available in the labor room.

Although there are some factual disputes in the record, the role of the jury is to make those factual determinations. We find that the evidence is factually sufficient to support the jury finding. This point of error is overruled.

## CAUSAL LINK TO SUPPORT MEDICAL EXPENSES

■ In its next point of error, Wadley contends that the trial court erred in entering a judgment in favor of the ADHS in the amount of $352,784 and postjudgment interest, because there was no evidence, or insufficient evidence, of a causal link between any injuries caused by negligence of the defendant and the amount of medical expenses awarded. We review the evidence by applying the standards previously set out.

The parties entered into a stipulation that the expenses incurred were reasonable and necessary, but the causation issue was reserved. Dr. Cardwell testified that the therapeutic maneuvers performed by Arkansas Children's Hospital were necessary **to treat the meconium aspiration syndrome suffered by the baby.** He further testified that the treatment modalities that were described in the records were reasonable efforts to treat the condition that is set forth in those records. There is evidence that indicates that the meconium aspiration made it necessary for the use of a respirator/ventilator at high pressure for sixteen days and that this continued high air pressure caused damage to the baby's airways, which became a massive aspiration syndrome. This in turn led to the need for therapeutic support to breathe and combat possible infections. We find that there is some evidence to support the jury's finding of causation.

Examining the evidence for factual sufficiency, we have also reviewed Wadley's response to the causation issue. Both sides agreed that a malfunction of the brain prevented the brain from sending the proper signals to cause the lungs to breathe. Murdock took the position that this was caused by the meconium aspiration depriving the brain of oxygen, and the hospital took the position that this was caused by genetic defects of the brain.

Eight doctors testified. Dr. Clark Green, who was one of the treating physicians of the baby, is a board certified pediatrician. He made a diagnosis of newborn massive aspiration syndrome with secondary problems of respiratory distress. He testified to finding meconium stained amniotic fluid with possible aspiration and found a lot of meconium below the vocal cords. His testimony did not directly speak to the treatment at the Arkansas Children's Hospital.

Dr. Robert Warren testified by video deposition. He is a pediatric pulmonologist. He testified that when a baby is on ventilator therapy too long, it can produce barotrauma, which is damage or destruction to the airways caused by the trauma of the ventilator. He had no opinion of whether the meconium aspiration caused such damage in the present case. Dr. Warren performed an intermittent role as a pulmonary consultant when the baby was hospitalized between June 1991 and February 1992. He testified that one thing that could have accounted for the airway damage was the long-term status of injury to the airway by barotracheotomy that was required by the suctioning that had to be done and by the ventilator and the supplemental oxygen. He also testified that some of the tests showed an immature or late development in the baby's lungs. He further testified and the record so reflects that the child had respiratory distress caused by syncytial virus (generally referred to as RSV). He testified that the baby was more susceptible to infections in the lungs and pulmonary system as a result of his condition. Dr. Warren did not testify specifically on any of the charges made by Arkansas Children's Hospital.

Dr. Michael Cardwell, a maternal fetal medicine specialist, testified that the treatment in Arkansas Children's Hospital was the result of the meconium aspiration syndrome suffered by the baby. He also testified that the baby had a small brain stem and agenesis of the corpus collasum, as well as

bronchomalacia, which can be a genetic defect.

Dr. Thomas Wilson, an obstetric and gynecology specialist, was one of the treating physicians at Wadley. He was on call the night of the birth and delivered the baby. He testified that the major problem that was expected was the corpus collasum was missing, the cingulate gyrus was missing, there was a cystic structure in the skull, and he did not know if the respiratory center of the brain would be present and functioning. He did not testify directly on the treatment at Arkansas Children's Hospital.

Dr. James Tanner, an obstetrician/gynecologist, testified as a nontreating expert. Based upon his review of the records, he testified that the labor progressed so precipitously there was simply not enough time for suctioning of the meconium during the birth process. He offered no testimony concerning the treatment at Arkansas Children's Hospital.

Dr. Robert Arrington, a neonatologist and director of the neonatal intensive care unit at Arkansas Children's Hospital, testified as a nontreating expert. He testified that the baby had several dysmorphic features, that the baby had fluid-filled spaces in the brain. He testified that the baby had mild meconium aspiration syndrome that caused the baby to be on the ventilator for twenty-seven hours. Arrington said that he believed the baby had significant meconium aspiration because it plugged up three endotracheal tubes, but that in the first hospitalization (at Arkansas Children's Hospital), the sixteen days on the ventilator were not related to the meconium aspiration. He testified that the baby had the genetic defect of agenesis of the corpus callosum, cerebellar, brain stem hypoplasia, probable mega cisterna magna. According to Arrington, only the first twenty-seven hours plus transport of treatment by Arkansas Children's Hospital was attributable to the meconium aspiration. He opined that from the records the second hospitalization appeared to have been a viral illness that necessitated going back on the ventilator and then complications from the ventilator to pneumonia and airway obstruction. On cross-examination, Dr. Arrington was referred back to his deposition where he testified about whether the baby had any hypoxic ischemic encephalopathy at all that was caused by combination of events at delivery and in the first ten to fifteen minutes of life. Arrington determined that the left bronchi stem was fifty percent smaller than the right bronchi stem and that the baby suffered from bronchomalacia, which may have explained the problems he experienced throughout his life and which made the baby infection prone. It was his position that the baby would have been on a ventilator even if there had been no meconium aspiration. He testified that he believed the genetic defects were the underlying cause of all the significant things that happened to the baby. On cross-examination, Dr. Arrington admitted that a baby could have suffered damage to the brain stem from lack of oxygen in a very extreme case.

Dr. Joanne Silvia Szabo, a neonatal-perinatal specialist with a subspeciality of pediatrics, was a treating physician at Arkansas Children's Hospital from February 14 to March 4, 1991. She testified that the baby had no problems related to meconium aspiration syndrome while she was caring for him. She testified that the genetic defects were the underlying cause of the baby's respiration problems. She further testified that she did not believe meconium played any part in the death of the baby.

Dr. Raymond Lewandowsky, a medical geneticist, testified that the baby had an underdeveloped brain and that the genetic defects were the cause of his problems. His opinion was that the brain stem was not damaged by a lack of oxygen (hypoxic ischemic encephalopathy).

Dr. Linda Jean Perrot, a pediatric and forensic pathologist, did an autopsy on the baby and concluded that the baby had Williams–Campbell Syndrome. This was based upon examination of the lungs under a microscope. On cross-examination, this witness may have been discredited before the jury by answering many questions, "I don't recall." For example, she was asked:

Q Did you learn that he [baby] had a massive aspiration syndrome right after

birth and was hospitalized for that in his first hospitalization?

A No.

. . . .

Q Did you examine any of his chest x-rays from his first ten days of life?

A No.

Q And were you asked to determine what factors in the child's history contributed to his death or made him more vulnerable to his death or caused disease in his body that contributed to his death?

A No.

. . . .

Q Do you know how many days he was on the ventilator?

A I don't recall.

Q Do you know what the ventilator pressures were?

A I don't recall.

Q Do you know what percent oxygen he was being given through the ventilator?

A I don't recall.

When asked what the clinical signs of meconium aspiration are, she testified, "I would defer that to an expert in that area." When asked if the microscopic slides of the brain were consistent with hypoxic ischemic encephalopathy, she answered "I would defer that to the neuropathologist."

Q What is it about his brain that you can recall that you can attest to directly?

A I don't recall.

Q Can multiple chronic infections, as well as esophageal reflux that gets into the lungs, do the kind of damage that you saw at autopsy?

A I would defer that to a pulmonary pathologist.

Q Wouldn't the best evidence of how his brain was functioning be how he was operating and doing clinically before he died?

A I would refer that to the pediatrician.

Q Did you express or form any opinions in doing your autopsy as to when the first brain damage from oxygen deprivation occurred?

A No.

She testified that her findings in the autopsy were not consistent with Dr. Warren's testimony of airway damage which was done by ventilator and supplemental oxygen.

Dr. James Rohrbaugh, a pediatric neurologist, testified that the two reasons the baby had trouble breathing were that his brain stem could not tell his lungs to move well enough and the cartilage in the lungs could not support these bronchioles correctly. He testified that the child was given Theophylline at the time of birth as a stimulant to tell the brain to work. He took the position that this was not because of meconium aspiration, but because of a genetic defect. His review of the records indicated that comfort care was being administered the last month or so of the baby's life. According to his testimony, he did not believe that the baby had a hypoxic ischemic injury shortly after the child was born, but that months later as the child had repeated episodes when the child could not breathe, then lack of oxygen did afflict the baby. He testified that the course of the child would have been the same whether there were problems with meconium. On cross-examination, he agreed that when a baby gets meconium in the lungs, it can cause meconium aspiration pneumonia and that people are capable of living reasonably normal lives even with the absence of a corpus callosum.

The mother, Kathy Murdock, testified that she was given a report prior to the baby being born showing certain defects, but she was much relieved based upon the doctor's prediction that there was a resemblance between the brain of her fetus and her own.

The exhibits in evidence state that the "MRI's (sic) were comparable of the mother's and fetus's brains." This information was also contained in a letter, which is in evidence, to Delia James, R.N.P. at the Miller County Health Unit from Dr. Steve M. Chatelain.

An outpatient record from Arkansas Children's Hospital, dated September 20, 1991, stated that the neonatal problems of Jessie Burgess were "meconium aspiration, HIE, agenesis of the corpus callosum, and Stick-

ler's Syndrome." The same problems were listed in the records of Arkansas Children's Hospital on April 5, 1991. In a hospital record dated March 20, 1991, the diagnosis is "meconium aspiration." In a record from Arkansas Children's Hospital dated September 26, 1991, the diagnosis is shown to be "prob. w/breathing," and the pertinent history/reason for procedure states "resp distress." An autopsy report states for the final anatomical diagnosis that the child had "bronchomalacia and bronchiectasis associated with hypotonia in a 13 month old white male with multiple congenital anomalies." In a final summary, the report states, "in this child it is felt to be congenital in nature due to the poor quality of the cartilage present rather than a complete deficiency of bronchial cartilage." In a report, dated January 22, 1991, from the Arkansas Children's Hospital indicating "Diagnostic Radiology," the diagnosis is shown to be "TNB/meconium aspiration/agenesis corpus collusum (sic)." The same diagnosis is shown on January 23, 1991, January 24, 1991, and February 18, 1991. A discharge summary on August 14, 1991, states "[t]he patient had been recently discharged from Arkansas Children's Hospital Neonatal Intensive Care Unit after one month's hospitalization and spent two weeks on the ventilator secondary to meconium aspiration." The death summary by Arkansas Children's Hospital describes the diagnosis as respiratory compromise. It gives the causation as progressive hypoxia, secondary to chronic pulmonary disease. The pre-operative diagnosis in the Surgical Anatomic Pathology Report was "Respirator dependent patient with possible bronchomalacia." The report states

[i]t is not possible to get an accurate assessment of bronchial size or whether bronchiocartilaginous development is normal in a biopsy of peripheral lung tissue as we have here. No airways with cartilage are present in this biopsy, and review of a case obtained in the same manner of an age matched patient without obvious airway abnormalities clinically, also like the presence of airways with cartilage. Thus, it is concluded that the lack of airways with cartilage in such a biopsy is normal. Similarly, abnormalities in airway diameter or bronchial generation cannot be assessed in this biopsy sample . . . .

The major pathology seen in this biopsy appears to be related to chronic airway changes, the chronic bronchiolitis, and the presence of foamy macrophages in the peribronchiolar region raises the possibility of chronic aspiration as an aggrevating (sic) occurrence in this patient.

The diagnosis on January 22, 1992 was "possible pneumonia." A pre-operative diagnosis and postoperative diagnosis on November 25, 1991 was "Ventilator dependent."

▮▮▮▮ It is well settled that a tortfeasor takes a plaintiff as he finds him. *Coates v. Whittington,* 758 S.W.2d 749 (Tex.1988). In the present case, even if the baby's inherent defects made him more susceptible to injury, this would not defeat or lessen the liability of a tortfeasor who proximately caused the injury. Also, the tortfeasor is responsible for any damages or disease which was brought about by the treatment performed as a result of the injury.

The evidence shows that the medical bills from Arkansas Children's Hospital introduced into evidence totaled $748,710.44. The jury returned a finding in the amount of $500,000, which indicates that some deductions were made from the amount due for the medical treatment.

The jury had evidence upon which it could have made a finding that the treatment at Arkansas Children's Hospital was caused by the meconium aspiration or the birth defects. We find that the evidence is legally and factually sufficient to support the jury's finding of reasonable and necessary expenses for medical and hospital care received by Jessie Burgess for treatment of injuries sustained by him as a result of the negligence of Wadley Hospital. This point of error is overruled.

The judgment of the trial court is modified to provide an additional recovery for Kathy Murdock in the amount of $147,216. As modified, it is affirmed.

BLEIL, Justice, dissenting.

Nine doctors testified. Not one testified that any of Wadley's conduct caused one

dollar of medical expenses. Nor did any other witness.

Kathy Murdock had previously borne a child with severe birth defects. That child died. Before Jessie Burgess was born, he was diagnosed as having extensive congenital birth defects, including defects affecting the brain and brain stem. He in fact was born with multiple birth defects. A little over a year and three-fourths of a million dollars later, the Burgess child died.

As indicated by the majority, the reasonableness and necessity of the medical expenses were stipulated. The question was whether Wadley's conduct proximately caused the medical treatment required. Nine medical experts testified. Three did not testify regarding causation. Five opined that almost all of the medical treatments, as well as the death of the child, resulted from the serious birth defects and that treatment for the meconium ingestion was incidental and brief.

Only one doctor might be said to have testified concerning a causal link. Michael Cardwell testified for the plaintiffs based upon his review of hospital records. However, the only testimony of his relating to causation occurred after the doctor was asked whether he had an opinion as to whether treatment for meconium aspiration was necessary:

A  Yes, I have an opinion.

Q  And what is your opinion?

A  In my opinion, the therapeutic maneuvers performed at Arkansas Children's Hospital is (sic) necessary to treat meconium aspiration syndrome suffered by baby Jessica (sic).

Q  Do you feel like the treatment modalities that are described in the records are reasonable efforts to treat the condition that's set forth in those records?

A  Yes, I feel that the treatments were necessary and reasonable in the circumstances.

No one testified what those treatments cost, and the cost is not apparent from any other evidence.

I find that no evidence shows a causal link between Wadley's conduct and the $500,-000.00 awarded by the jury or the $352,-784.00 awarded by the trial court. Therefore, I respectfully dissent.