534 S.E.2d 295

**Jody Lee HASELDEN, as Personal Representative of the Estate of Carolyn H. Hill, deceased, Respondent,**

v.

**S. Perry DAVIS, M.D., Appellant.**

**No. 3198.**

Court of Appeals of South Carolina.

Heard May 9, 2000.
Decided June 19, 2000.
Rehearing Denied Sept. 9, 2000.

488

Charles E. Hill, Teresa A. Arnold, both of Turner, Padget, Graham & Laney, of Columbia, for appellant.

Leslie Jay Shayne, and Larry C. Brandt, both of Walhalla, for respondent.

GOOLSBY, Judge:

In these wrongful death and survival actions, a Sumter County jury awarded a total of $1,082,103.71 to Carolyn H. Hill's statutory beneficiaries and $1,000,000.00 to her estate. S. Perry Davis, M.D., the sole remaining defendant at trial, appeals. We affirm.

## FACTS

Hill had been a patient of Davis's family practice since August 5, 1974. On October 25, 1991, Hill consulted Davis complaining of soreness in her left breast. After examining Hill, Davis referred her to Tuomey Regional Medical Center

in Sumter for a bilateral mammogram, which was done November 5, 1991.

The entry on Hill's chart for October 25, 1991, contained the handwritten notation "two weeks." It is unclear whether or not that notation meant Hill was given a follow-up appointment for that time; however, it is undisputed Hill did not see Davis in the weeks following the mammogram and Davis's office made no attempt to contact her about this matter.

Martin Rosefield, M.D., the radiologist who read Hill's mammogram, found it revealed a "cluster of microcalcifications in the right breast. . . ." In his report, Rosefield noted, "[T]hese calcifications must be considered suspicious for possible neoplastic change." Rosefield also recommended an excisional biopsy for a definitive diagnosis.

Davis received the suspicious mammogram report, but did not read it until 1993. He neither advised Hill of the results of the test nor sent her for an excisional biopsy in 1991 as recommended.

On June 22, 1993, Hill consulted Davis about a lump in her right breast. At this visit, Davis's nurse noticed the 1991 mammogram, which had been incorrectly placed at the back of Hill's chart. Davis read the 1991 mammogram during this visit. He also referred Hill to a surgeon, who ordered another mammogram. This 1993 mammogram revealed a large six-centimeter carcinoma in the right breast, and the report stated the cancer had metastasized to Hill's lymph nodes.

Hill underwent a mastectomy, which was followed by a biopsy of a cervical lymph node, chemotherapy, and radiation treatments. Hill was in pain after the mastectomy and suffered from fatigue as a result of the chemotherapy. As the disease progressed, Hill became bedridden, and her fourteen-year old daughter Emily became primarily responsible for providing her daily care and for maintaining their household. Eventually, both Hill and Emily went to live with Hill's son, Jody Haselden, and his wife in their small apartment in Newport News, Virginia. There, the Haseldens' dining room became Hill's hospital room. Hill died on August 22, 1994, at age 47. Her death certificate indicated the cause of death was breast carcinoma.

Haselden, as the personal representative of Hill's estate, filed survival and wrongful death actions on November 1, 1994,

against Davis, Rosefield, and Tuomey Regional Medical Center. Before trial, Rosefield and Tuomey Regional Medical Center were dismissed as defendants. The actions were consolidated and proceeded to trial against Davis.

The trial commenced on March 24, 1997, and ended in jury awards of $1,082,103.71 in the wrongful death action and $1,000,000.00 in the survival action. In arriving at the verdicts, however, the jury determined that Davis and Hill had each been negligent in proximately causing Hill's injuries. Because the jury attributed ten per cent of the combined negligence to Hill and ninety per cent to Davis, the trial court combined the verdicts and reduced the aggregate amount to $1,873,893.30, which was then enrolled as a judgment against Davis. The trial court denied Davis's motions for judgment notwithstanding the verdict, new trial, and new trial nisi remittitur.

## DISCUSSION

### A. Judgment Notwithstanding the Verdict

■ Davis first argues the trial court should have granted his motion for judgment notwithstanding the verdict because Haselden failed to prove the necessary causal link between his alleged misconduct and Hill's death. To support his argument, Davis contends the evidence at trial demonstrated, at most, the "loss of chance," a doctrine that has been rejected in this state. We disagree.

In *Jones v. Owings*,[1] the South Carolina Supreme Court declined to adopt the "loss of chance" doctrine, which, in the context of medical malpractice, "permits a recovery when the delay in proper diagnosis or treatment of a medical condition results in the patient being deprived of a less [than an] even chance of surviving or recovering."[2] In rejecting the doctrine, the supreme court, quoting from *Cooper v. Sisters of Charity*,[3] stated, " 'We consider the better rule to be that in

---

1. 318 S.C. 72, 456 S.E.2d 371 (1995).

2. *Id.* at 75, 456 S.E.2d at 373.

3. 27 Ohio St.2d 242, 272 N.E.2d 97, 103 (1971), *overruled by Roberts v. Ohio Permanente Med. Group*, 76 Ohio St.3d 483, 668 N.E.2d 480 (1996).

order to comport with the standard of proof of proximate cause, plaintiff in a malpractice case must prove that defendant's negligence, *in probability,* proximately caused the death.'"[4]

Notwithstanding the holding in *Jones,* however, there was ample evidence in this case that Hill's death most probably resulted from Davis's delay in reading and acting on the 1991 mammogram report.

Billy Clowney, M.D., whom Hill consulted after receiving a verbal referral from Davis, testified the 1993 growth was in the same area where microcalcifications detected in 1991 appeared. He stated that Hill would have had a greater than seventy-per-cent chance of recovery if she had been treated in 1991. Peter Klacksman, M.D., testified that Hill had about an eighty-per-cent chance of surviving twenty years had she been treated in 1991. Klacksman further believed that, when Hill learned of the tumor in July 1993, she had only a fifteen-per-cent chance of surviving five years.

Barry Singer, M.D., testified the 1991 mammogram indicated either a stage one tumor with no axillary node involvement or at most a very early stage two tumor with microscopic axillary node involvement. Singer further stated the probability of cure for stage one cancer was at least ninety per cent and that for early stage two cancer was better than seventy or eighty per cent. In addition, he noted that Hill's tumor had progressed to either an advanced stage three or a stage four cancer by July 1993. The probability of cure at that time, according to Singer, was "extremely small," *i.e.,* at best less than twenty per cent. Finally, Singer opined that, to a reasonable degree of medical certainty, the delay in Hill's treatment caused her tumor to be "upstaged" and, therefore, was the cause of her death in that, by the time the diagnosis was established, the tumor was not curable.[5]

---

4. *Jones,* 318 S.C. at 76, 456 S.E.2d at 373 (emphasis in original).

5. On appeal, Davis argues Singer's testimony falls short of satisfying the "most probably" rule because it was "premised on statistics" and because "Singer admitted the only way to prognosticate specifically in Mrs. Hill's case was if a biopsy had been done." We find no merit to this argument. In our view, the fact that an expert opinion may be premised on statistics affects the weight rather than the competency of

In contrast to the decedent's chance of survival in *Jones*, then, the record here has testimony that Hill would have had more than an even chance of recovering if she had been advised of her condition in 1991 and was deprived of this chance because of the delay in her treatment. We therefore hold the evidence satisfied the "most probably" requirement for expert medical testimony on causation[6] and uphold the trial court's refusal to set aside the verdict.

### B. New Trial Absolute and New Trial Nisi Remittitur

■ In addition to Hill's medical expenses,[7] the jury returned verdicts of $1,000,000.00 in each of the actions. Davis argues the trial court should have either set these verdicts aside or reduced them because they were grossly excessive, or, in the alternative, unduly generous.

■ "A new trial absolute should be granted only if the verdict is so grossly excessive that it shocks the conscience of the court and clearly indicates the amount of the verdict was the result of caprice, passion, prejudice, partiality, corruption, or other improper motive."[8] Furthermore, "[t]he denial of the motion for a new trial nisi is within the trial judge's discretion and will not be reversed on appeal absent an abuse of discretion."[9] Similarly, the trial court alone has the discretionary power to grant a new trial nisi upon finding the jury verdict is merely inadequate or excessive.[10]

---

this evidence. *Cf. Clark v. Ross*, 284 S.C. 543, 328 S.E.2d 91 (Ct.App. 1985) (holding the trial court, in a medical malpractice action based on the failure to diagnose and treat Rocky Mountain Spotted Fever, committed no error in admitting statistical evidence concerning the correlation between the survival rate and the promptness of treatment).

6. *See Payton v. Kearse*, 329 S.C. 51, 61, 495 S.E.2d 205, 211 (1998) ("Before expert medical testimony is admissible on the question of causation between the plaintiff's injuries and the acts of the defendant, the testimony must satisfy the 'most probably' rule.").

7. This issue is discussed in Section D of this opinion.

8. *Knoke v. South Carolina Dep't of Parks, Recreation & Tourism*, 324 S.C. 136, 141, 478 S.E.2d 256, 258 (1996).

9. *Hawkins v. Greenwood Dev. Corp.*, 328 S.C. 585, 600–01, 493 S.E.2d 875, 883 (Ct.App.1997), *cert. denied* (Oct. 9, 1998).

10. *O'Neal v. Bowles*, 314 S.C. 525, 431 S.E.2d 555 (1993).

As Davis notes, Hill's children were emancipated at the time of her death and did not produce evidence of pecuniary loss. Furthermore, Haselden, Hill's son and the personal representative of her estate, was living a considerable distance from his mother until shortly before she died. Nonetheless, there was ample testimony about the shock, grief, and personal loss they experienced as a result of their mother's death.[11] Hill's twin sister Catherine Olsen testified Emily had a very close relationship with Hill. Olsen also stated that both Haselden and Emily were greatly affected by their mother's death and that Haselden suffered from insomnia and migraines after Hill died. Haselden testified he never knew his father and Hill was "pretty much all [he] had" while he was growing up. Similarly, Emily, who was only fifteen when Hill died, testified she was raised by Hill. Emily testified that both she and Haselden were hurt to see the pain and suffering their mother endured. Emily was present when Hill died and testified that Hill's death was a "major loss" to Haselden and that it was hard for her to go through each day knowing she could not pick up the telephone and speak to her mother.

Similarly, we hold the evidence supports the trial court's refusal to set aside or modify the verdict in the survival action. The record has exhaustive testimony about the conscious pain and suffering Hill experienced before her death. Davis himself testified Hill felt the lump in her breast several months before she consulted him on June 22, 1993. Hill underwent a mastectomy, chemotherapy, and radiation treatments. The effects of Hill's illness and the side effects of the treatments she received included hair loss, nausea, dizziness, headaches, incontinence, loss of mobility, and the inability to speak clearly. Eventually, Hill became bedridden, and it became painful for her to be moved from her bed to her wheelchair. She also became severely depressed knowing she would die soon and leave her children.

We therefore agree with the trial court that neither verdict was grossly excessive or shocking so as to warrant a new trial

---

11. See Knoke, 324 S.C. at 141, 478 S.E.2d at 258 (holding that, in a wrongful death action, the decedent's beneficiaries may recover damages for "pecuniary loss, mental shock and suffering, wounded feelings, grief, sorrow, and loss of society and companionship" resulting from the death of the decedent).

absolute. We further hold the trial court acted within its discretion in denying a new trial nisi remittitur.

## C. Evidentiary Rulings

Davis alleges error in several evidentiary rulings by the trial court: (1) the admission of a videotape as demonstrative evidence; (2) the admission of testimony that, on several occasions when Emily went to Davis for medical treatment on her own behalf, Hill accompanied her; (3) the admission of testimony that Emily gave birth to a child in 1995; (4) the admission of certain testimony about the applicable standard of care; and (5) the qualification of an expert witness.

### 1. Videotape

The trial court denied a motion in limine by Davis to exclude a "Day in the Life" videotape of Hill that was made eleven days before her death. Davis unsuccessfully raised the issue again in his post-trial motions. In support of his argument, Davis alleges the probative value of the videotape was substantially outweighed by the danger of: (1) unfair prejudice, (2) confusion of the issues, and (3) misleading of the jury.[12] We disagree.

The admissibility of evidence is within the trial court's discretion.[13] Absent a showing of a clear abuse of that discretion, the trial court's admission or rejection of evidence is not subject to reversal on appeal.[14]

Videotapes are extensively used in civil litigation and are routinely admitted into evidence by courts throughout the country.[15] Specifically, "day in the life" videotapes have been

---

**12.** *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....").

**13.** *Washington v. Whitaker*, 317 S.C. 108, 451 S.E.2d 894 (1994); *see also Davis v. Traylor*, 340 S.C. 150, 530 S.E.2d 385 (2000) (applying the same standard to demonstrative evidence).

**14.** *Carlyle v. Tuomey Hosp.*, 305 S.C. 187, 407 S.E.2d 630 (1991).

**15.** *See, e.g., Tsesmelys v. Dublin Truck Leasing Corp.*, 78 F.R.D. 181 (E.D.Tenn.1976), (allowing a videotaped deposition notwithstanding the recognition of certain problems); *Reggio v. Louisiana Gas Serv. Co.*, 333

allowed into evidence and used in personal injury cases.[16]

In *Hawkins v. Pathology Associates,*[17] this court affirmed the demonstrative use of a videotape showing a terminally ill woman and her family. As in the present case, the sound was turned down and a family member narrated and explained the events portrayed on the tape. We held the videotape was not unduly prejudicial and the trial court did not abuse its discretion in permitting the jury to view it. ·

Similarly, we find no abuse of discretion in the trial court's decision to allow the jury to view the videotape of Hill's daily activities near the end of her life. We have viewed the videotape and find it to be a realistic depiction of Hill's condition and quality of life just shortly before her demise. Despite the emotional impact, the tape was neither graphic, gruesome, nor grotesque.

As in *Hawkins,* the audio portion was turned off while the jury viewed videotape, with Haselden responding to his attorney's questions while the videotape was played. Haselden stated the videotape showed the hydraulic lift required to move Hill from her bed into her wheelchair. The videotape also showed Hill's pain medications, sleeping medications, and medications for swelling.[18]

Davis argues the videotape was confusing because it gave the jury the mistaken impression that Hill's large size resulted from her disease. Davis suggests the problem was exacerbat-

So.2d 395 (La.Ct.App.), *cert. denied,* 337 So.2d 187(La.) and 337 So.2d 526 (La.1976) (upholding the use of a videotape depicting the physical therapy administered to a plaintiff in a personal injury action).

**16.** *Jurors at the Movies: Day in the Life Videos as Effective Evidentiary Tool or Unfairly Prejudicial Device?,* 27 Suffolk U.L.Rev. 789 (1993); *see also Pisel v. Stamford Hosp.,* 180 Conn. 314, 430 A.2d 1 (1980) (upholding the admission in a medical malpractice action of a videotape showing the plaintiff's daily activities at the time of trial); *Barenbrugge v. Rich,* 141 Ill.App.3d 1046, 96 Ill.Dec. 163, 490 N.E.2d 1368 (1996) (case similar to this one in that it concerns a lawsuit alleging the negligent failure to diagnose breast cancer and the use of a "day in the life" videotape depicting the plaintiff's pain and suffering during her bout with cancer).

**17.** 330 S.C. 92, 498 S.E.2d 395 (Ct.App.1998).

**18.** Hill took 15 to 25 pills each day.

ed by remarks from various witnesses that Hill was "swollen." We find no reversible error.

First, contrary to Davis's arguments that the videotape gave the jurors a false impression that Hill's swollen condition resulted from her cancer, Haselden testified that Hill took medication for swelling. Furthermore, even if the videotape and the accompanying remarks were misleading, there was ample evidence that Davis could have used to correct the misapprehension. As Davis's own brief recounts, his records, which were admitted into evidence, documented Hill's weight gain before her cancer was diagnosed.[19] No expert testified that Hill's weight gain was related to the developing cancer. Davis himself also testified Hill's medications did not cause swelling. Whether or not Hill's condition resulted from either the disease or her medications was a question of fact for the jury.

We further find no merit to Davis's argument that the videotape incorrectly suggested that he was responsible for Hill's disfigurement from her having to undergo a mastectomy. In support of this argument, Davis maintains that, even if the cancer had been diagnosed and treatment promptly begun in 1991, Hill would still have needed a mastectomy. To the contrary, both Clowney and Singer testified that, if Hill's cancer had been diagnosed in 1991, she would most likely have been offered less radical alternatives to a mastectomy.

### 2. Testimony that Hill was Present During Emily's Appointments with Davis

Davis additionally asserts the trial court erred in admitting testimony that Emily had obtained medical treatment from Davis between 1991 and 1993 and that Hill accompanied Emily to Davis's office for these visits. We find this evidence was introduced to rebut Davis's assertion he did not inform Hill of her mammogram results because he had no contact with her as she failed to keep her follow-up appointment. There was no error in its admission.

---

**19.** Davis's progress notes show Hill weighed 281 pounds on October 25, 1991. Her weight on June 22, 1993, was 345–1/2 pounds.

### 3. Testimony About Emily's Daughter

██ Davis also contends Emily's testimony regarding her daughter was inadmissible because the child was not a beneficiary of Hill's estate. In no way, however, did Emily discuss any damages incurred by her child. To the contrary, Emily discussed only her own grief from losing the guidance, support, and love of her mother in raising her child and her anguish about the fact that her daughter would never know Hill, i.e., the child's maternal grandmother. We therefore find no abuse of discretion in the admission of this testimony.

### 4. Testimony Regarding the Applicable Standard of Care

██ Davis avers the trial court erred in permitting testimony from two physicians that his negligence was not excused by Hill's negligence in failing to keep her follow-up appointment in 1991. We disagree.

Davis opened the door to this testimony by asserting Hill's failure to return for a follow-up appointment as a defense. The testimony was a proper response to Davis's assertion that the applicable standard of care changed because Hill failed to return for her appointment.

Furthermore, contrary to Davis's argument in his brief, neither physician stated a legal conclusion. The testimony elicited from both witnesses established only: (1) that the standard of care required of a family practice physician remains the same even if a patient fails to do certain things that could have enabled the physician to correct a breach of that standard; and (2) that Davis's responsibility to read and follow up on all tests reports was not contingent on anything Hill should have done and neglected to do.

Davis also contends the trial court erred in denying his motion to strike the testimony of one of Haselden's expert witnesses because the witness allegedly testified incorrectly that the standard of care was perfection.[20] The testimony, however, was elicited by Davis's own attorney on cross-examination; therefore, this argument is without merit.[21]

---

**20.** We express no view of Davis's characterization of this testimony.

**21.** See *Miller v. City of West Columbia*, 322 S.C. 224, 230, 471 S.E.2d 683, 686 (1996) ("One who purposefully elicits testimony on a particu-

### 5. Qualification of Expert Witness

██ Davis alleges the trial court erred in qualifying Simone Sommer, M.D., as an expert in family practice because Sommer no longer practiced in that area. We disagree.

 The qualification of an expert witness is a matter within the discretion of the trial court.[22] The South Carolina Rules of Evidence allow a witness to be qualified as an expert based on knowledge, skill, experience, training, or education.[23] There is no requirement that the expert must work in the same field or area of practice in order to be properly qualified in that area.

Sommer testified she was a family physician. She graduated from George Washington Medical Center and trained at Duke University in the Department of Family Medicine. Sommer also served as a faculty member in the University of North Carolina's Department of Family Medicine. Sommer was therefore qualified to testify as an expert in the field of family practice based on her education, experience, and training.

### D. Limitation of Medical Expenses

██ Davis further argues the trial court erred in declining to limit evidence of Hill's medical expenses to the amount paid by Medicaid. We disagree.

Over Davis's objection, Haselden was permitted to introduce evidence that Hill incurred medical expenses in the amount of $77,905.21. This total included $75,729.63 covering services for which Medicaid paid $24,109.04.[24] The difference, then, between the "billed" amounts and the amounts actually "paid" by Medicaid, totaled $51,620.59.

---

lar subject without reserving his objections and receives the relevant response waives any alleged error.").

22. *Payton,* 329 S.C. at 60, 495 S.E.2d at 211.

23. Rule 702, SCRE.

24. The claimed expenses included charges Hill incurred in Virginia. These charges are not disputed on appeal.

Davis argues on appeal that the trial court should have limited Haselden's recovery for medical expenses to the amounts that Medicaid actually paid for them.[25]

In support of his argument, he notes the medical care providers who accepted Medicaid payments on Hill's behalf are prohibited from attempting to collect the difference between the "billed" amounts and the "paid" amounts from her estate, and allowing Haselden to claim the face amount of the bills would therefore result in a windfall to the beneficiaries of Hill's estate.

In overruling Davis's objection, the trial court cited the collateral source rule. When announcing its ruling, however, the trial court also stated, "And remember[,] that evidence is nothing more than evidence of what is reasonable and appropriate charges for the services rendered. It's not—and it's only evidence."

■■■■■■ South Carolina has long followed the collateral source rule.[26] Under this rule, "compensation received by an injured party from a source wholly independent of the wrong-doer will not reduce the amount of damages owed by the wrongdoer."[27] The policy behind the rule is that a benefit directed to an injured party should not be shifted so as to result in a windfall for the tortfeasor.[28] At times, then, "while a plaintiff's recovery under the ordinary negligence rule is limited to damages which will make him whole, the collateral

---

**25.** At Davis's request, the trial court admitted as a court exhibit a letter from the Department of Health and Human Services to Haselden's attorney showing the gross amount of the bills for Hill's services and the corresponding Medicaid payments. The question of whether or not the jury should have been given access to the information in this letter is not before us. In any event, it appears from the colloquy between counsel and the trial court that it was "conceded that Medicaid benefit payment of [$23,000] plus would be admissible."

**26.** *Estate of Rattenni v. Grainger*, 298 S.C. 276, 379 S.E.2d 890 (1989).

**27.** *Citizens & S. Nat'l Bank v. Gregory*, 320 S.C. 90, 92, 463 S.E.2d 317, 318 (1995).

**28.** *Dixon v. Besco Eng'g*, 320 S.C. 174, 463 S.E.2d 636 (Ct.App.1995).

source rule allows a plaintiff further recovery under certain circumstances even though he has suffered no loss." [29]

Davis argues the amount Medicaid paid to discharge the various medical expenses Hill incurred is conclusive evidence of the reasonable value of medical services that she received. He contends this amount is conclusive because a Medicaid provider may not seek reimbursement from the patient for any amount over and above the Medicaid payment.[30] We disagree with this argument.

We are aware that cases from other jurisdictions have considered whether write-offs of unsatisfied charges for medical services covered by Medicaid constitute a collateral source.[31] It is our view, however, that the issue here, as presented to the trial court, does not involve the collateral source rule so much as it does the question of whether evidence of the total amounts billed for services for which Medicaid made a partial payment was properly admitted to prove damages.

 "It is a fundamental principle of the law of damages that a person who suffers personal injuries because of the negligence of another is entitled to recover the reasonable value of medical care and expenses incurred for the treatment of the injuries to the time of trial...." [32] Furthermore, "recovery for medical expenses is, as a rule, controlled by what the services rendered were reasonably worth and not by what was

---

**29.** 22 Am.Jur.2d *Damages* § 566 at 640 (1988).

**30.** *See* 42 C.F.R. § 447.15 (2000) ("A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual.").

**31.** *E.g. McAmis v. Wallace*, 980 F.Supp. 181 (W.D.Va.1997); *Candler Hosp. v. Dent*, 228 Ga.App. 421, 491 S.E.2d 868 (1997); *Texarkana Mem'l Hosp. v. Murdock*, 903 S.W.2d 868 (Tex.Ct.App.1995), *rev'd on other grounds*, 946 S.W.2d 836 (Tex.1997).

**32.** 22 Am.Jur.2d *Damages* § 197 at 169; *cf. Haltiwanger v. Barr*, 258 S.C. 27, 186 S.E.2d 819 (1972) (stating that the plaintiff in a personal injury action can recover for the reasonable value of future medical expenses to the extent they are reasonably certain to result in the future from the injury giving rise to the lawsuit).

actually paid or contracted to be paid." [33] We hold the amount Medicaid paid toward Hill's medical treatment is only one measure of the reasonable value of the corresponding services that she received.[34] We therefore affirm the trial court's decision to allow Haselden to introduce evidence of the costs that Hill would have had to pay for her treatment if she had not been a Medicaid patient.[35]

### E. Jury Instructions

 Davis next asserts the trial court erred in declining his request for a jury instruction limiting the claim for Hill's claim for conscious pain and suffering from the time she

---

**33.** 22 Am.Jur.2d *Damages* § 198 at 170.

**34.** In order to receive federal appropriations, a state plan for medical assistance, had to provide for payment "through the use of rates ... which the State finds ... are reasonable and adequate to meet the *costs which must be incurred by efficiently and economically operated facilities....* " 42 U.S.C. § 1396a(a)(13)(A) (1992) (emphasis added). Subparagraph (A) was substantially rewritten in 1997. The South Carolina Supreme Court has recognized that providers do not always recover their out-of-pocket costs when they provide services under the Medicaid program. *See Anco, Inc. v. State Health and Human Servs. Fin. Comm'n*, 300 S.C. 432, 438, 388 S.E.2d 780, 784 (1989) ("Under the efficient cost standard, states are not required to reimburse individual providers for costs actually or reasonably incurred."). The possibility that a provider may actually incur losses for services paid by Medicaid would make it unfair to hold that the amount of the Medicaid payments is the deciding factor in determining the reasonable value of those services.

**35.** In his brief, Davis cites *Bates v. Hogg*, 22 Kan.App.2d 702, 921 P.2d 249, *review denied*, 260 Kan. 991 (1996), in which the Kansas Court of Appeals, in a divided opinion, held that the appropriate measure of damages was the amount actually paid by Medicaid on the injured plaintiff's behalf. Although there are striking factual parallels to the present case, we hold *Bates* is distinguishable. Kansas administrative regulations provide that "the amount allowed by Medicaid becomes the amount due and is the 'customary charge' under the circumstances we have before us." *Bates*, 921 P.2d at 253; *see also* Kan.Admin.Regs. 30–5–81b(e) (stating state-operated hospitals shall be reimbursed the lesser of reasonable costs or customary charges for covered inpatient services and reasonable fees as related to customary charges for covered outpatient services). In contrast, the South Carolina regulations allow a Medicaid provider who is dissatisfied with a maximum allowable payment rate to request a reconsideration from the State Health and Human Services Finance Commission and provides a mechanism for further appeal, if necessary. 27 S.C.Code Ann.Regs. 126–150, –335, and –560 (1992).

discovered she had cancer to the time of her death.[36] We disagree. Davis's testimony indicated Hill suffered pain and problems with her breast in 1991 and felt a lump in her breast off and on for several months before her June 1993 visit. Based on this testimony, the jury could conclude Hill had suffered even before she became aware of the serious nature of her illness.

### F. Mortality Tables

Davis additionally argues the court erred in permitting the jury to use the South Carolina mortality tables in the absence of any evidence that Hill could have lived to her full life expectancy. We disagree.

The trial court charged the jury as follows:

In determining how long the decedent would have lived, had the decedent lived a normal life, you *may* consider her life expectancy at the time of her death. The mortality table received in evidence may be considered in your determining how long the plaintiff may be expected to live. *Such tables are not binding on you but may be considered together with other evidence in the case bearing on the plaintiff's health, age and physical condition before the injury and death in determining the probable length of the plaintiff's life.*

If you find that this defendant was not negligent towards this plaintiff or rather the plaintiff decedent or that the actions were not the is proximate cause in the case of the plaintiff's injuries, then you should disregard this table and the plaintiff's life expectancy. (emphases added).

A jury charge that is substantially correct when read as a whole and adequately covers the law does not require reversal.[37] Regarding the use of mortality tables in litigation, the legislature has provided:

When it is necessary, in any civil action or other mode of litigation, to establish the life expectancy of any person from any period in his life, whether he be living at the time or not, the table below shall be received in all courts and by all

---

**36.** *See Smalls v. South Carolina Dep't of Educ.,* 339 S.C. 208, 216, 528 S.E.2d 682, 686 (2000) ("Damages in a survival action include recovery for the deceased's conscious pain and suffering. . . .").

**37.** *Keaton v. Greenville Hosp. Sys.,* 334 S.C. 488, 514 S.E.2d 570 (1999).

*persons having power to determine litigation as evidence (along with other evidence as to his health, constitution and habits) of the life expectancy of such person.*[38]

In addition, the supreme court has held, "It is proper to charge the mortality tables in a personal injury action when there is evidence of permanent injury."[39]

Here, the jurors were advised they were not bound by the mortality table in determining Hill's life expectancy. In addition, there was evidence as to Hill's chance of survival if her cancer had been treated in 1991. Accordingly, we find no abuse of discretion in the trial court's instruction regarding the jury's use of the mortality table.

### G. Thirteenth Juror

Davis contends the trial court erred in declining his motion for a new trial under the thirteenth juror doctrine. We find no error.

"Under the 'thirteenth juror doctrine,' a trial judge may grant a new trial absolute when he finds the evidence does not justify the verdict. This ruling has also been termed a granting of a new trial upon the facts."[40]

In reviewing the denial of a motion for a new trial under the thirteenth juror doctrine, we consider only whether there is any evidence to support the trial court's decision.[41] To reverse such a denial, we must find the moving party was entitled to a directed verdict at trial.[42] As discussed above, there was expert testimony to support a finding that the proximate cause of Hill's premature death was Davis's failure to timely read and act on her 1991 mammogram. We there-

---

**38.** S.C.Code Ann. § 19–1–150 (1985) (emphasis added).

**39.** *Abofreka v. Alston Tobacco Co.*, 288 S.C. 122, 126, 341 S.E.2d 622, 625 (1986).

**40.** *Vinson v. Hartley*, 324 S.C. 389, 402, 477 S.E.2d 715, 722 (Ct.App. 1996).

**41.** *Folkens v. Hunt*, 300 S.C. 251, 387 S.E.2d 265 (1990).

**42.** *Parker v. Evening Post Pub. Co.*, 317 S.C. 236, 452 S.E.2d 640 (Ct.App.1994).

fore uphold the trial court's refusal to grant a new trial under the thirteenth juror doctrine.

**AFFIRMED.**

CURETON, J., and MOREHEAD, Acting Judge, concur.