775 S.E.2d 58

Samantha JAMISON, as Personal Representative
of the Estate of Jayden Joenelle Jamison–
Barber, Deceased, Respondent,

v.

Ansley L. HILTON, M.D., individually and as Agent, Servant or
Employee of Rock Hill Gynecological and Obstetrical Associ-
ates, P.A.; Christopher B. Benson, M.D., as Agent, Servant or
Employee of Rock Hill Gynecological and Obstetrical Associ-
ates, P.A., and Rock Hill Gynecological and Obstetrical Associ-
ates, P.A., Defendants,

Of whom Rock Hill Gynecological and Obstetrical
Associates, PA, is the Appellant.

Appellate Case No. 2013–001711.
No. 5330.

Court of Appeals of South Carolina.

Heard April 14, 2015.
Decided July 15, 2015.

Thomas C. Salane and R. Hawthorne Barrett, both of Turner Padget Graham & Laney, PA, of Columbia, for appellant.

James W. Boyd, of James W. Boyd, Attorney, and David Bradley Jordan, of Jordan & Dunn, LLC, both of Rock Hill, for respondent.

LOCKEMY, J.

In this medical malpractice action, Rock Hill Gynological and Obstetrical Associates, PA, (the Practice) argues the trial court erred in denying its motion for judgment notwithstanding the verdict as to Samantha Jamison's allegations of negligence in the death of her son, Jayden. We affirm.

## FACTS/PROCEDURAL BACKGROUND

The Practice assumed the pre-natal care of Samantha Jamison a little over halfway through her pregnancy in July 2008. Jamison came to the Practice with pregnancy risks due to her chronic hypertension.

On August 9, 2008, Jamison went to the emergency room complaining of lower abdominal pain. Dr. Gregory Miller, a physician with the Practice, attended to Jamison at the hospital. After noting Jamison's elevated blood pressure, Dr. Miller conducted a series of tests that ruled out preterm labor. Lab results, including blood work and a urinalysis, revealed no medical grounds for intervention or immediate treatment. Dr. Miller discharged Jamison and told her to keep her next scheduled office visit at the Practice.

Jamison returned to the Practice for a checkup on August 25, 2008, and again saw Dr. Miller. Jamison's only complaint that day was of swelling in her left ankle. Based on an examination and the results of tests he conducted, Dr. Miller found no complications or dangers with Jamison's pregnancy. Dr. Miller did not order a non-stress test. Jamison had no complaints of decreased fetal movement when she saw Dr. Miller on August 25, 2008. Dr. Miller nevertheless instructed Jamison to start doing "kick counts" to monitor the timing and frequency of her baby's movement.

On the morning of September 5, 2008, Jamison became concerned about feeling the baby move less frequently and went to the Practice. Jamison arrived at the office around 8:40 a.m. and waited approximately one hour to be seen. The first available professional was nurse practitioner Robin Pruitt, who examined Jamison. The examination included taking

Jamison's blood pressure and checking the fetal heartbeat. Based on the results of the examination, Pruitt ordered a non-stress test. The non-stress test began around 10 a.m. and took roughly thirty minutes.

After the non-stress test, the nurses told Jamison they were going to do a biophysical profile, which would evaluate the baby's movement, among other things. A sonographer performed that test in the office. The biophysical profile ran for approximately ten minutes, during which time the baby had a normal heart rate. After the ten minutes had elapsed, Dr. Ansley Hilton looked over the preliminary results. Dr. Hilton determined the baby was in a breach presentation and was not moving as much as a 32–week old fetus normally would be expected to move. Dr. Hilton then stopped the test around 11 a.m. because she wanted to send Jamison to the hospital in case any emergency treatment was necessary. Dr. Hilton instructed Jamison to go straight to the labor and delivery section of the hospital, which was approximately five minutes away from the office. Before releasing Jamison, Dr. Hilton confirmed that Jamison had transportation to the hospital and knew how to get to labor and delivery. Dr. Hilton then called labor and delivery to explain the situation and inform them that Jamison would be arriving soon. During her phone call to the hospital, Dr. Hilton also discussed Jamison's case with Dr. Christopher Benson, another physician with the Practice who was on call at the hospital that morning. After that conversation, Dr. Benson got everything ready at the hospital for an emergency cesarean section (c-section) in case one had to be performed.

According to Jamison, the admissions process at the hospital, which did not involve any of the Practice's employees, took around thirty minutes. A hospital employee then took Jamison to a room where other hospital staff members examined her. The nurses involved in that examination called Dr. Benson to notify him that Jamison had arrived, but that they could not find a fetal heartbeat. Dr. Benson got to the room within two minutes of receiving the call and performed an ultrasound. He was also unable to find a fetal heartbeat, and he informed Jamison that the baby was deceased. Later that day, a C-section was performed. No cause of death has been determined.

Jamison filed a summons and complaint in 2011, listing the following defendants: (1) Dr. Hilton, (2) Dr. Benson, and (3) the Practice. The complaint alleged Drs. Hilton and/or Benson committed malpractice that led to the pre-delivery death of Jamison's son, Jayden. All of the defendants filed and served a timely answer denying the allegations.

The case was called to trial on April 8, 2013. Jamison presented the testimony of two experts. Dr. Edward Karotkin opined Jayden died sometime between 11 and 11:48 a.m. on September 5, 2008, and his death was foreseeable based upon evidence he was not growing appropriately in the weeks prior to his death and his abnormal fetal heart rate on the morning of September 5th. According to Dr. Kartokin, Jayden would have survived had a C-section been performed prior to 11:45 a.m. on September 5th. Jamison also called Dr. Douglas Phillips as an expert witness. Dr. Phillips opined Drs. Hilton and Benson both breached the applicable standard of care in treating Jamison. According to Dr. Phillips, Dr. Hilton failed to adequately inform Jamison that she needed to get to the hospital as soon as possible for an immediate C-section. Dr. Phillips opined Dr. Benson failed to take an active role to have Jamison admitted to the hospital and transported to labor and delivery in a timely manner. Dr. Phillips also testified Dr. Miller was negligent in failing to order a non-stress test and biophysical profile during Jamison's August 25, 2008 office visit, and Practice employees did not ensure Jamison received timely care on the morning of September 5, 2008.

Following Jamison's case-in-chief, the defendants moved for a directed verdict arguing there was no expert testimony that the defendants caused Jayden's death. The trial court denied the motion.

Drs. Hilton and Benson both testified they could not determine what caused Jayden's death. Similarly, all of the experts who testified were unable to offer opinions as to the cause of death. The defendants' two experts opined Drs. Hilton and Benson did not breach the applicable standard of care and did not cause Jayden's death. At the close of their case, the defendants renewed their directed verdict motions, which the trial judge again denied.

The case was submitted to the jury on April 12, 2013. The verdict form consisted of three questions. In response to the first two questions, the jury found neither Dr. Hilton nor Dr. Benson committed any negligence that proximately caused damages to Jamison. Responding to the third question, however, the jury found the Practice was negligent. The jury awarded Jamison $90,000 in damages.

Thereafter, the defendants made oral motions for a new trial or, in the alternative, for judgment as a matter of law. The trial court denied those motions from the bench. On April 25, 2013, the Practice filed a Rule 59(e), SCRCP, motion which the trial court denied in an order filed on July 15, 2013. The Practice appealed.

## STANDARD OF REVIEW

A motion for a judgment notwithstanding the verdict (JNOV) is merely a renewal of the directed verdict motion. *Wright v. Craft*, 372 S.C. 1, 20, 640 S.E.2d 486, 496 (Ct.App. 2006). When reviewing the trial court's ruling on a motion for a directed verdict or a JNOV, this court must apply the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 27–28, 602 S.E.2d 772, 782 (2004). The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt. *Strange v. S.C. Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 429–30, 445 S.E.2d 439, 440 (1994). Moreover, "[a] motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict." *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998). In deciding such motions, "neither the trial court nor the appellate court has the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence." *Welch v. Epstein*, 342 S.C. 279, 300, 536 S.E.2d 408, 419 (Ct.App.2000).

## LAW/ANALYSIS

The Practice argues the trial court erred in denying its JNOV motion because there was no legal or evidentiary basis for a finding of liability against the Practice. The Practice contends the defense verdicts in favor of Drs. Hilton and

Benson prevented any finding of vicarious liability for the Practice, and the record does not support a verdict against the Practice based on acts or omissions of employees other than Drs. Hilton and Benson.

■ Conversely, Jamison contends the Practice's argument that there is no evidence of malpractice by any of the defendants that proximately caused her damages is unpreserved.[1] Additionally, Jamison argues her expert witness, Dr. Phillips, testified as to the negligence committed by other employees of the Practice.

## I. Law

■ A plaintiff must prove the following facts by a preponderance of the evidence to establish a cause of action for medical malpractice:

(1) The presence of a doctor-patient relationship between the parties;

(2) Recognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;

(3) The medical or health professional's negligence, deviating from generally accepted standards, practices, and procedures;

(4) Such negligence being a proximate cause of the plaintiff's injury; and

---

1. Jamison asserts the Practice's proximate cause argument is not preserved because it was not raised in the Practice's directed verdict motion. We disagree. *See Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (holding an issue must have been raised to and ruled upon by the trial judge to be preserved for appellate review). Counsel for the Practice made the following motion at trial:

Yes, Your Honor, we would like to make a motion for a directed verdict based on the grounds that the plaintiff has not proved her case. Basically, Dr. Phillips, while he testified to the standard of care, ultimately on cross examination opined under oath here in court that anything [sic] that they did or didn't do caused the baby to die, so on that basis of the fact that he had-ultimately had no opinion that the defendants, any of the defendants cause [sic] the baby's death is subject for a directed verdict and on that—on that ground.

We find the motion properly identified the Practice's argument concerning the lack of expert testimony establishing causation.

(5) An injury to the plaintiff.

*Brouwer v. Sisters of Charity Providence Hospitals,* 409 S.C. 514, 521, 763 S.E.2d 200, 203 (2014) (citing 27 S.C. Jur. Med. & Health Prof'ls § 10 (2014)). "A plaintiff in a medical malpractice case must establish by expert testimony both the standard of care and the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct." *Carver v. Med. Soc. of S.C.,* 286 S.C. 347, 350, 334 S.E.2d 125, 127 (Ct.App.1985).

 "When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence." *Hoard ex rel. Hoard v. Roper Hosp., Inc.,* 387 S.C. 539, 546, 694 S.E.2d 1, 5 (2010) (quoting *Ellis v. Oliver,* 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996)). "When expert testimony is the only evidence of proximate cause relied upon, the testimony 'must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection.'" *Id.* at 546–47, 694 S.E.2d at 5 (quoting *Ellis* at 125, 473 S.E.2d at 795).

## II. Allegations Against Other Employees

While a majority of the testimony at trial focused on the actions of Drs. Hilton and Benson, there was some testimony regarding the actions of Practice employees other than Drs. Hilton and Benson.

### A. August 25, 2008 Office Visit

On August 25, 2008, Jamison had an office visit with Dr. Miller. Her only complaint that day was swelling in her left ankle. Jamison did not report any decreased fetal movement at that time. Dr. Miller examined Jamison and found no complications or dangers with the pregnancy. According to Dr. Miller, he did not order a non-stress test because he did not believe one was indicated by the applicable medical stan-

dards. After the office visit on August 25th, Jamison did not return to the Practice until September 5th.

Jamison's expert, Dr. Phillips, opined that Dr. Miller breached the applicable standard of care by not ordering a non-stress test and biophysical profile either during the office visit on August 25, 2008, or within one week of that visit. Dr. Phillips believed those tests were necessary due to Jamison's chronic hypertension. However, Dr. Phillips could not testify with any degree of certainty what the tests would have shown had they been run. Dr. Phillips did not opine that the alleged breach of care by Dr. Miller proximately caused Jayden's death. He testified Dr. Miller was not "directly" responsible for Jayden's death and agreed that the opinion stated in his deposition ("I don't think Dr. Miller caused the baby to die") was still his opinion at trial.[2]

## B. Wait Time on September 5, 2008

Although she did not have an appointment, Jamison went to the Practice on the morning of September 5, 2008, because she was concerned about feeling less fetal movement. She arrived before 9 a.m. and signed the intake sheet, which indicated she was the twentieth patient on the waiting list. There is no evidence Jamison asked to be seen immediately or that she was in any acute distress. Jamison testified she informed the staff when she arrived that she had called to say she was coming in, but she did not specifically testify as to what she told them upon her arrival.

Jamison waited about an hour before the first available care provider saw her. The nurse practitioner who saw Jamison ordered a non-stress test, which revealed a fetal heartbeat within normal limits. Nevertheless, the nurse practitioner decided to conduct a biophysical profile to obtain more information about the baby. All of the medical experts at trial agreed the baby was alive when Dr. Hilton stopped the biophysical profile and told Jamison to go immediately to the hospital shortly before 11 a.m.

Dr. Phillips testified it was a breach of the applicable standard of care not to move Jamison to the front of the

---

2. Jamison's other expert, Dr. Karotkin, did not express any opinions regarding Dr. Miller's treatment of Jamison.

waiting list based on her complaints of decreased fetal movement. Dr. Phillips further opined it was a breach of the standard of care to make Jamison wait more than an hour before seeing a care provider when she presented with that complaint. Dr. Karotkin testified Jayden's death was preventable and he would have lived had a C-section been performed prior to the morning of September 5th. According to Dr. Karotkin, there was evidence in the weeks prior to Jayden's death that he was not growing appropriately and there were some abnormal fetal heart rate tracings in the office on the morning of September 5th, indicating he was in distress and needed to be delivered quickly. Furthermore, Dr. Karotkin testified that while there was not a lot of evidence as to "what the nature of the episode was," Jayden was deprived of oxygen after 11 a.m. on September 5th, which caused his heart rate to fall and deprived his organs of oxygen and blood flow.

Viewing the evidence in the light most favorable to Jamison, we find there was some evidence of negligence by the Practice. During the direct examination of Dr. Phillips, the following exchange occurred:

Q: Doctor, do you have a conclusion to a reasonable degree of medical certainty as to whether or not that delay in treatment caused or contributed to Jayden's death, the death of Samantha's son?

A: Yes, it did.

Dr. Phillips explained:

Jayden would've lived because there wouldn't have been the delay in doing those two tests, and there wouldn't [sic] been subsequent delay in getting the patient to the hospital as there was in this particular case. You had delays with the testing; you had delays from the time the patient left the hospital (sic) to the time she arrived in labor and delivery. Those delays were sufficient enough for a normal heartbeat that was present at 158 beats per minute in the office to end up with no heartbeat when she finally got there and they attempted to find the heartbeat after she got there on admission. So those delays, the delay from the leaving the office to getting to labor and delivery as well as the delays in performing those two tests resulted in the demise of Jayden.

Based on the expert testimony in the record, we affirm the trial court's denial of the Practice's JNOV motion. Looking especially at Dr. Phillips' testimony regarding delay in treatment, we find there was some evidence of negligence on behalf of employees of the Practice other than Drs. Hilton and Benson.

## CONCLUSION

We affirm the trial court's denial of the Practice's motion for JNOV as to Samantha Jamison's allegations of negligence in the death of her son.

SHORT and McDONALD, JJ., concur.