# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Shon Turner, as Personal Representative of the Estate of
Charles Mikell, deceased, Appellant,

v.

Medical University of South Carolina, Respondent.

Appellate Case No. 2016-001986

———————

Appeal From Charleston County
J. C. Nicholson, Jr., Circuit Court Judge

———————

Opinion No. 5723
Heard February 13, 2019 – Filed May 6, 2020

———————

## AFFIRMED IN PART AND REVERSED AND REMANDED IN PART

———————

Robert B. Ransom, of Leventis & Ransom, of Columbia;
and Alex Nicholas Apostolou, of Alex N. Apostolou,
LLC, of North Charleston, both for Appellant.

M. Dawes Cooke, Jr. and John William Fletcher, of
Barnwell Whaley Patterson & Helms, LLC, of
Charleston, for Respondent.

———————

**WILLIAMS, J.:** In this medical malpractice action, Shon Turner, as Personal
Representative of the Estate of Charles Mikell, deceased, appeals the circuit court's
(1) grant of a partial directed verdict in favor of the Medical University of South
Carolina (MUSC) on Turner's physician negligence claim; (2) finding Turner's
negligent supervision claim sounded in ordinary negligence and that ordinary

negligence was not pled; (3) refusal to instruct the jury that Turner's physician negligence claim had been removed from consideration; (3) admitting Dr. Michael Zile's expert opinion and refusal to strike his testimony; (4) admitting medical records; and (5) admitting a blank copy of an MUSC Mayday record and testimony about Mayday records.  We affirm in part and reverse and remand in part.

## FACTS/PROCEDURAL HISTORY

In 2003, Charles Mikell, who had chronic heart failure, became a patient at MUSC.  On October 1, 2010, at the age of forty-nine, Mikell underwent a colonoscopy at MUSC.  Dr. Eric Nelson, an attending anesthesiologist, and Donna Embrey (Nurse Embrey), an attending certified nurse anesthetist (CRNA), administered anesthesia to Mikell during his colonoscopy.  On the day of Mikell's procedure, Dr. Nelson was supervising Nurse Embrey and one other CRNA.

At the time of the colonoscopy, Mikell was overweight and suffered from several preexisting conditions, including sleep apnea, chronic heart failure, an elevated heart rate, chronic kidney disease, hypertension, diabetes, a genetic blood disorder, gallbladder disease, and high cholesterol.  Before the colonoscopy, Dr. Nelson and Nurse Embrey developed a medical plan for administering anesthesia to Mikell based on his known health problems.

During the colonoscopy, Mikell was monitored by sensors that were connected to monitors that displayed his vital signs, such as his blood oxygen saturation levels (saturation levels), heart rate, and blood pressure.  The monitors were connected to an electronic medical record software created by Picis (Picis).  The Picis anesthesia record (the Picis Record) showed real time variables plotted on a data graph that could be printed in various time increments.  The Picis Record also contained a narrative with information that was entered by individual anesthesia providers.  Picis had an audit trail function that showed a username, date, and time stamp each time the record was accessed to create, modify, or delete an entry.

Nurse Embrey testified that at the start of Mikell's colonoscopy, the monitors were displaying Mikell's vital signs but Picis did not capture and record data for several minutes.  Nurse Embrey stated she angled the computer and keyboard so she could monitor Mikell while she sent two messages and paged an information technology specialist (IT specialist) in an attempt to fix Picis.  After she paged the IT specialist, but before Picis was fixed, Nurse Embrey administered an anesthetic to Mikell.  Dr. Nelson testified Mikell's medical chart indicated the anesthetic was administered around 7:41 A.M., and Nurse Embrey testified Dr. Nelson was not in

the room when the anesthetic was administered. Picis did not begin to record Mikell's vital signs until 7:48 A.M., but Dr. Nelson and Dr. Scott Reeves, the Chairman of the Department of Anesthesia at MUSC, testified even if Picis was not working properly, medical providers could create a paper chart.

The following table shows Mikell's saturation levels as captured in the Picis Record from 7:48 A.M. to 8:00 A.M.:

| Time | 7:48 | 7:49 | 7:50 | 7:51 | 7:52 | 7:53 | 7:54 | 7:55 | 7:56 | 7:57 | 7:58 | 7:59 | 8:00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saturation Levels | 96.7 | 75 | 69.2 | 90.1 | 80.7 | 88 | 73.3 | 62.1 | 75 | 41.2 | 47.5 | -- | 67.8 |

Nurse Embrey testified there were problems with Mikell's saturation levels during the colonoscopy, so she reduced the anesthetic at 7:53 A.M., turned Mikell's body to help manage his airway, and told a nurse to call Dr. Nelson, who arrived almost immediately. Mikell had low saturation levels, his heart rate slowed, his heart's electrical system stopped contracting normally, and he went into cardiac arrest. Mikell was intubated and defibrillated, and he regained a pulse. Mikell was put into a medically induced coma; experienced hypothermia and kidney failure; and received renal dialysis, a tracheotomy, and mechanical ventilation. He was hospitalized for fifty days, and he underwent physical therapy, rehabilitation, and home health care. Following his hospitalization, Mikell discontinued certain medications he took before the colonoscopy, including medications for an arrhythmia and anticlotting. On January 2, 2011, Mikell died.

Turner, as personal representative of Mikell's estate, filed this action against MUSC for medical malpractice, survivorship, and wrongful death and named MUSC and "its actual and apparent agents, servants[,] and employees" as parties to the action.

The Picis Record showed an entry from Dr. Nelson stating he was present when the anesthetic was administered at 7:48 A.M. An entry from Nurse Embrey indicated Dr. Nelson left the room at 7:51 A.M., but the Picis Record showed Nurse Embrey initially entered his departure time as 7:50 A.M. Dr. Nelson testified he went across the hall, where he could have been reached by pager or by someone yelling through the door. Dr. Nelson stated he would not have left the room if Mikell's saturation levels were not in the nineties because he would not leave the room if he thought a patient was "teetering on the edge." Dr. Nelson indicated you would intervene in a situation when the saturation levels "dipped to [eighty], and then he dipped to [seventy-three]." When asked generally about life threatening

saturation levels, Nurse Embrey testified that if the saturation level was less than ninety, there would be concerns and the method of care would be changed. Nurse Embrey stated that at 7:49 A.M., Dr. Nelson entered information at the Picis workstation. When asked if entering information at that time would be appropriate while a patient's saturation levels were seventy-five, Nurse Embrey indicated it was not appropriate, and if she or Dr. Nelson would have noticed the saturation level was that low, they would have acted differently.

The Picis Record printed on the day of the procedure showed Dr. Nelson made an entry at 8:00 A.M. that stated when he returned to Mikell's room, Mikell had low saturation levels and he had an abnormal heart rhythm and no pulse, so a Mayday[1] team was called. At trial, Dr. Nelson testified that when he came back into the room, Nurse Embrey was not using a respirator bag to deliver air to Mikell, but he indicated she began to do so when he turned Mikell and began chest compressions. The Picis Record printed the next day had the same entry, but Nurse Embrey's initials were linked to the narrative, and the narrative indicated Dr. Nelson came into the room at 7:56 A.M. At trial, Nurse Embrey testified she changed the time of Dr. Nelson's entry to make sure the times were accurate because charting is not always done contemporaneously with patient care in critical situations.

At trial, Dr. William Andrew Kofke was qualified as an expert in the areas of anesthesia and critical care. Dr. Kofke testified an anesthesiologist can properly supervise up to four CRNAs at one time and that an attending physician should be within a two-minute range from an operating room. He also testified that when Mikell's saturation levels dropped to the eighties, maneuvers should have been performed to lift the chin, open the mouth, and support the tongue to prevent a further drop in his saturation levels. He stated minutes and seconds are important in responding to a patient under cardiac arrest. Dr. Kofke indicated that when the saturation levels of a patient who is under anesthesia drop, an anesthesiologist can decide to give a higher oxygen concentration, employ a maneuver to lift the chin and jaw to open the airway, and then if that does not work, put in an oral airway, utilize a laryngeal mask, or insert a breathing tube. He opined Dr. Nelson breached the standard of care because Mikell was a tenuous patient and Dr. Nelson did not give him the necessary attention when he made only a brief stop in Mikell's room and left the room when Mikell had low saturation levels. Dr. Kofke additionally opined Nurse Embrey breached the standard of care because she did not adequately

---

[1] The MUSC policy manual provides that a Mayday is a respiratory or cardiac emergency or any other situation perceived by a care giver to be a life threatening situation.

focus on Mikell because she was distracted at that time by her efforts to fix Picis. Dr. Kofke explained that if Nurse Embrey or Dr. Nelson had met the standard of care, Mikell would not have suffered cardiac arrest. He opined that if they were both in the room, they would have been able to make sure Mikell's airway was clear. He testified he believed to a reasonable degree of medical certainty that Mikell's cardiac arrest was the cause of his death.

MUSC's policy required a Mayday to be documented using a Mayday record. The Mayday record from Mikell's procedure (Mikell's Mayday Record) was lost or destroyed, and at trial, MUSC introduced a blank copy of a Mayday record (the Blank Mayday Record) for the purpose of showing the type of record MUSC routinely uses for Mayday events. The circuit court admitted the Blank Mayday Record over Turner's objection.

Sheila Scarbrough, a critical interventions manager at MUSC at the time of Mikell's colonoscopy, testified the Blank Mayday Record was representative of the version of the Mayday records used at the time of Mikell's colonoscopy. She testified Mayday records generally do not include information about what occurred prior to the Mayday event because the records only contain information about the resuscitation of a patient. Dr. Mark Payne, the gastroenterologist who performed Mikell's colonoscopy, testified Mayday records contained information from the time the Mayday team arrived, including medications and what took place during the Mayday. Dr. George Guldan, who responded to Mikell's Mayday, also testified that to his knowledge, there is no documentation from before a Mayday team is called included in a Mayday record because the Mayday record is a narrative of the actual resuscitation event.

Dr. Zile, Mikell's cardiologist at MUSC, testified Mikell's chances of survival and hospitalization were the same after his cardiac arrest in 2010 as they were in 2003. Specifically, he testified Mikell's chance of dying within five years was fifty percent or greater and the chance of him being hospitalized for recurrent heart failure within any six-month period was fifty percent. Later, when Dr. Zile repeated this opinion, Turner objected and moved to strike the testimony. The circuit court found it would not allow Dr. Zile to offer expert opinion testimony about Mikell's chances of survival, and it limited Dr. Zile's testimony to his experience as Mikell's treating physician. Turner renewed his motion to strike Dr. Zile's opinion testimony, and that motion was denied. Turner also objected to Dr. Zile's testimony about Mikell being taken off of certain medications following his cardiac arrest. The circuit court found MUSC could ask general questions about whether it would be appropriate for a person with cardiac arrest to be taken off of

the medications, sustained subsequent objections about why the medications were not restarted, and then overruled Turner's objection as to why one of the medications was not restarted. Turner also objected to the admission of medical records from Dr. Zile's cardiology records pertaining to Mikell. The circuit court overruled this objection.

At the close of Turner's case and again at the close of evidence, MUSC made motions for a directed verdict on the survival and wrongful death claims, arguing Turner failed to prove a breach of the standard of care and causation. The circuit court denied both motions. At the close of evidence, MUSC made a motion for a partial directed verdict as to any negligence on the part of a licensed physician, Dr. Nelson. The circuit court granted MUSC's motion for a partial directed verdict noting, "I just have a real difficulty in figuring out what Dr. Nelson did wrong." The circuit court indicated Nurse Embrey "did what she should have done and there's no difference than what the doctor would have done, assuming he would have been in the room."

While the jury was deliberating, Turner expressed concern that a partial directed verdict was granted as to Dr. Nelson's physician negligence, but the jury was not informed they should not consider Dr. Nelson's conduct. Turner asked the circuit court to wait until the jury made a determination and, if necessary, to send the jury back to indicate on their verdict form whether they found any malpractice by Dr. Nelson or by a physician. MUSC argued the jury should be instructed they could only consider Nurse Embrey's negligence and not other MUSC personnel because the court directed a verdict for MUSC's liability as to Dr. Nelson's actions. Turner indicated he did not want the circuit court to do so, and the court did not deliver such an instruction.

As to the professional negligence cause of action, the jury did not "unanimously find by the preponderance of the evidence that [MUSC] was negligent in [its] care of Mr. Mikell[.]" Thus, the jury did not reach the survival or wrongful death causes of action. This appeal followed.

**LAW/ANALYSIS**

**I.   Directed Verdict**

Turner argues the circuit court erred in granting a partial directed verdict in favor of MUSC on Turner's physician negligence claim.  We agree.[2]

When considering a motion for a directed verdict, the circuit court must "view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motion and [must] deny the motion when either the evidence yields more than one inference or its inference is in doubt." *Estate of Carr ex rel. Bolton v. Circle S Enters., Inc.*, 379 S.C. 31, 38, 664 S.E.2d 83, 86 (Ct. App. 2008).  "When reviewing the [circuit] court's decision on a motion for directed verdict, this court must employ the same standard as the [circuit] court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party."[3]  *McKaughan v. Upstate Lung & Critical Care Specialists, P.C.*, 421 S.C. 185, 189, 805 S.E.2d 212, 214 (Ct. App. 2017) (quoting *Burnett v. Family Kingdom, Inc.* 387 S.C. 183, 188, 691 S.E.2d 170, 173 (Ct. App. 2010)).  This court will reverse the circuit court's ruling on a directed verdict motion only when there is no evidence to support the ruling or when the ruling is controlled by an error of law.  *Estate of Carr*, 379 S.C. at 39, 664 S.E.2d at 86.  "Essentially, this [c]ourt must resolve whether it would be reasonably conceivable to have a verdict for a party opposing the motion under the facts as liberally construed in the opposing party's favor."  *Pye v. Estate of Fox*, 369 S.C. 555, 564, 633 S.E.2d 505, 509 (2006).  "On review, an appellate court will affirm the granting of a directed verdict in favor of the defendant when there is no evidence on any one element of the alleged cause of action."  *Fletcher v. Med. Univ. of S.C.*, 390 S.C. 458, 462, 702 S.E.2d 372, 374 (Ct. App. 2010).  "When considering directed verdict motions, neither the [circuit] court nor the appellate court has authority to decide

---

[2] Turner also argues the circuit court erred in granting MUSC's motion for a partial directed verdict when it previously denied two of MUSC's motions for a directed verdict on all of Turner's claims.  We find this argument is without merit.  MUSC's previous motions requested a directed verdict as to both the survival and wrongful death causes of action against MUSC as a whole based on failure of proof on the breach of standard of care and causation.  On the other hand, the motion for a partial directed verdict dealt with the more narrow issue of physician negligence.

[3] MUSC made a motion for partial summary judgment, but the circuit court construed the motion as a motion for a partial directed verdict.  Turner did not appeal which term was used and the standard of review for a motion for a directed verdict mirrors the standard of review for a motion for summary judgment.  *See Baughman v. Am. Tel. & Tel. Co.*, 306 S.C. 101, 114–15, 410 S.E.2d 537, 545 (1991).

credibility issues or to resolve conflicts in the testimony or evidence." *Estate of Carr*, 379 S.C. at 39, 664 S.E.2d at 86.

Subsection 15-79-110(6) of the South Carolina Code (Supp. 2019) defines medical malpractice as "doing that which the reasonably prudent health care provider or health care institution would not do or not doing that which the reasonably prudent health care provider or health care institution would do in the same or similar circumstances." Our supreme court has found a plaintiff is required to prove the following facts by the preponderance of the evidence to establish a cause of action for medical malpractice:

> (1) The presence of a doctor-patient relationship between the parties;
>
> (2) Recognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;
>
> (3) The medical or health professional's negligence, deviating from generally accepted standards, practices, and procedures;
>
> (4) Such negligence being a proximate cause of the plaintiff's injury; and
>
> (5) An injury to the plaintiff.

*Brouwer v. Sisters of Charity Providence Hosps.*, 409 S.C. 514, 521, 763 S.E.2d 200, 203 (2014).

MUSC does not dispute the existence of a doctor-patient relationship between Dr. Nelson and Mikell, and at trial, Dr. Nelson testified he was the attending anesthesiologist during Mikell's colonoscopy. There was also evidence presented that Mikell was injured. During the colonoscopy, Mikell went into cardiac arrest and he was intubated and defibrillated before regaining a pulse. Doctors put Mikell into a medically induced coma, and he experienced induced hypothermia, kidney failure, renal dialysis, a tracheotomy, and mechanical ventilation. Mikell was hospitalized for fifty days, and he underwent physical therapy, rehabilitation,

and home health care before his death.  Thus, we focus on the elements of breach of the standard of care and proximate cause.

### A.        Standard of Care and Breach of the Standard of Care

Expert testimony is required to establish the duty owed to the patient and the breach of that duty in medical malpractice claims unless the subject matter of the claim falls within a layman's common knowledge or experience.  *Dawkins v. Union Hosp. Dist.*, 408 S.C. 171, 176, 758 S.E.2d 501, 504 (2014).  Our supreme court has found that expert testimony is not required in a medical malpractice case to show that the defendant breached the standard of care when the "common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts."  *Green v. Lilliewood*, 272 S.C. 186, 192, 249 S.E.2d 910, 913 (1978) (quoting *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965) (emphasis omitted)).  Furthermore, our supreme court has found expert testimony is not required to establish negligence in a medical malpractice case "when the act complained of was done in the face of a proscription known to the actor."  *Cox v. Lund*, 286 S.C. 410, 417, 334 S.E.2d 116, 120 (1985).

In *Cox*, a doctor punctured a patient's colon during a colonoscopy.  *Id*. at 413, 334 S.E.2d at 118.  The doctor testified the colon was prepared properly and visibility was adequate, and he acknowledged an instrument in a colonoscopy should not be advanced when the doctor could not see.  *Id*. at 417, 334 S.E.2d at 120.  Another doctor noted the colon was "totally unprepared," and a radiologist stated an x-ray showed the presence of matter in the colon.  *Id*.  Our supreme court held that if the jury found the colon was not properly prepared, so that the doctor was unable to adequately see, but the doctor advanced the colonoscope anyway, a finding of negligence would fall within the "common knowledge" exception because "[e]xpert testimony is not required to establish negligence when the act complained of was done in the face of a proscription known to the actor."  *Id*.

Likewise, in this case, Dr. Nelson acknowledged the standard of care—an anesthesiologist should not leave the room when a patient's saturation levels were not consistently in the nineties—when he stated, "I wouldn't have left the room if I thought [Mikell] was teetering on the edge.  I would have had to see consistently his saturations were in the [nineties] before I would have stepped out of the room." He also noted "later on when [Mikell's saturation levels] dipped to [eighty], and then he dipped to [seventy-three], those [were] a little troubling.  Then you want to intervene again."

The Picis Record—containing the only evidence in the record of Mikell's saturation levels—solely showed a saturation level in the nineties at 7:48 A.M. and 7:51 A.M.[4] MUSC argues the saturation levels in the Picis Record—which are only recorded once per minute—do not necessarily indicate Dr. Nelson did not consistently see saturation levels in the nineties before he left the room because Dr. Nelson was able to continuously see Mikell's saturation levels on other monitors.[5] At 7:48 A.M.—the same time the Picis started recording Mikell's saturation levels—a note in the Picis Record indicated Dr. Nelson was present, a nasal airway was inserted, and Mikell's saturation levels were up to ninety-four. There is a question of fact regarding whether Dr. Nelson left the room at 7:50 A.M.—when the Picis Record showed Mikell's saturation level was 69.2—or at 7:51 A.M.— when the Picis Record showed Mikell's saturation level was 90.1. There is also a question of fact regarding how long Dr. Nelson stayed out of the room despite Mikell's tenuous condition—one version of the Picis Record indicates Dr. Nelson returned to the room at 7:56 A.M. while another version indicates he returned at 8:00 A.M. Furthermore, Dr. Nelson agreed that when Picis began recording the saturation levels, Mikell's saturation levels were already "headed down the Matterhorn into Death Valley."

Dr. Kofke also testified as to the applicable standard of care. *See Dawkins*, 408 S.C. at 176, 758 S.E.2d at 504 (providing expert testimony is required to establish duty and breach of duty in medical malpractice cases); *Brouwer*, 409 S.C. at 521, 763 S.E.2d at 203 (finding that to establish an action for medical malpractice, a plaintiff must establish the "[r]ecognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances"). Dr. Kofke testified an anesthesiologist may properly supervise up to four CRNAs at one time and should be within a two-minute range from an operating room. However, Dr. Kofke noted the standard of care when a patient's airway is obstructed and the patient's saturation levels drop below the nineties is to perform various maneuvers to lift the chin, open the mouth, and support the tongue in order to support the airway and increase the saturation levels. He stated that if such maneuvers were not successful, the standard of care would be to insert an oral or nasal airway or,

---

[4] Although there was testimony that a patient's vital signs would continue to be displayed on other monitors and could be charted on paper when Picis was not recording, there is no evidence that such a paper chart was created in this case.
[5] Dr. Nelson testified he was able to see Mikell's saturation levels every time Mikell's heart beat—approximately eighty times per minute.

ultimately, a breathing tube.  Dr. Kofke indicated these actions should be taken before saturation levels begin to fall to dangerous levels.

Dr. Kofke's testimony also provided evidence of Dr. Nelson's breach of the standard of care.  *See Dawkins*, 408 S.C. at 176, 758 S.E.2d at 504 (finding expert testimony is required to establish duty and breach of duty in medical malpractice cases); *Brouwer*, 409 S.C. at 521, 763 S.E.2d at 203 (providing that to establish an action for medical malpractice, a plaintiff must establish the medical professional's breach of the standard of care).  Dr. Kofke opined that Dr. Nelson breached the standard of care because Dr. Nelson failed to adequately attend to Mikell—a known tenuous patient—because he (1) only made a brief stop in Mikell's room and (2) left the room even though Mikell's saturation levels were consistently low.

Based on the foregoing, we find the evidence yields more than one inference, and under the facts as liberally construed in Turner's favor, it would be reasonably conceivable for a jury to find Dr. Nelson breached the standard of care.  *See Estate of Carr*, 379 S.C. at 38, 664 S.E.2d at 86 (requiring the circuit court to liberally construe the facts in favor of the party opposing a motion for directed verdict  and to deny the motion if there is more than one inference or an inference is in doubt).

### B.     Proximate Cause

"[N]egligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided." *James v. Lister*, 331 S.C. 277, 286, 500 S.E.2d 198, 203 (Ct. App. 1998) (quoting *Ellis v. Oliver*, 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996)).  "When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence."  *McKaughan*, 421 S.C. at 190, 805 S.E.2d at 214 (quoting *Jamison v. Hilton*, 413 S.C. 133, 141, 775 S.E.2d 58, 62 (Ct. App. 2015)).  "When expert testimony is the only evidence of proximate cause relied upon, the testimony must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection."  *Id.* (quoting *Hilton*, 413 S.C. at 141, 775 S.E.2d at 62).  "Only on the rarest occasion should the [circuit] court determine the issue of proximate cause as a matter of law."  *Id.* (quoting *Burnett*, 387 S.C. at 191, 691 S.E.2d at 175).

Dr. Kofke testified to a reasonable degree of medical certainty that if either Nurse Embrey or Dr. Nelson had met the standard of care, Mikell would not have suffered cardiac arrest and subsequent hospitalization. He stated that when Mikell's saturation levels began to drop into the eighties, if Nurse Embrey and Dr. Nelson would have (1) been in the room attending to Mikell and (2) begun supporting Mikell's airway, Mikell likely would not have gone into cardiac arrest or ended up in critical care. Dr. Kofke indicated Mikell was a large man and it would have been difficult for Nurse Embrey to support his airway by herself. Although a breathing tube was ultimately inserted, Dr. Kofke opined that minutes or seconds are important in responding to a patient that stops breathing or whose heart stops functioning properly. Thus, we find it would be reasonably conceivable for a jury to find Dr. Nelson proximately caused Mikell's injuries. *See Estate of Carr*, 379 S.C. at 38, 664 S.E.2d at 86 (requiring the circuit court to liberally construe the facts in favor of the party opposing a motion for directed verdict and to deny the motion if there is more than one inference or an inference is in doubt).

After careful review of the record, we find there is sufficient evidence for a reasonable jury to conclude the elements of medical malpractice were met. Thus, we find the partial directed verdict in favor of MUSC should not have been granted, and we reverse and remand this issue to the circuit court for further proceedings.[6]

## II. Jury Instruction

Turner argues the circuit court erred in failing to instruct the jury that his physician negligence claim was removed from its consideration as a result of the partial directed verdict. We find this issue is not preserved for appellate review.

---

[6] Turner also argues the circuit court erred in finding his claim that Dr. Nelson did not adequately supervise Nurse Embry was not a claim for medical malpractice, but rather sounded in ordinary negligence. We find Turner misconstrued the circuit court's holding as the circuit court merely noted that any negligent supervision by Dr. Nelson did not meet the elements of medical malpractice to overcome the grant of a directed verdict. Because our reversal of the directed verdict is dispositive of this issue, we need not address it as Turner's claim may be heard on remand. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

After the circuit court granted a partial directed verdict as to physician negligence, Turner requested that the circuit court submit the negligence of both Nurse Embrey and Dr. Nelson separately to the jury, arguing if the jury found Dr. Nelson was negligent, the circuit court could cure that finding with a judgment notwithstanding the verdict. However, Turner did not ask the circuit court to instruct the jury that his physician negligence claim was removed from its consideration as a result of the partial directed verdict. Therefore, this issue is not preserved for appellate review. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the [circuit court] to be preserved for appellate review."); *see also Dunes W. Golf Club, LLC v. Town of Mount Pleasant*, 401 S.C. 280, 302 n.11, 737 S.E.2d 601, 612 n.11 (2013) (providing that a party may not raise one argument below and an alternate argument on appeal).[7]

**III**. **Medical Records**

Turner argues the circuit court erred in admitting a large volume of medical records without finding that the records would assist the jury and not lead to confusion. We disagree.

The admission or exclusion of evidence is within the circuit court's discretion, and the circuit court's ruling on the admissibility of evidence is not subject to reversal on appeal absent a showing of a clear abuse of that discretion. *Haselden v. Davis*, 341 S.C. 486, 497, 534 S.E.2d 295, 301 (Ct. App. 2000), *aff'd*, 353 S.C. 481, 579 S.E.2d 293 (2003). "An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion is without evidentiary support." *Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005). "To warrant reversal based on the admission or exclusion of evidence, the appellant must prove

---

[7] Although MUSC asked the circuit court to instruct the jury that they could only consider Nurse Embrey's alleged negligence as a result of the partial directed verdict, Turner cannot bootstrap an issue for appeal by way of MUSC's request. *See Tupper v. Dorchester Cty*, 326 S.C. 318, 324 n.3, 487 S.E.2d 187, 190 n.3 (1997) (finding the appellant's argument was not preserved for appellate review because it was not raised to or ruled upon by the circuit court because even though the appellant's co-defendant raised the issue to the circuit court, the appellant could not "bootstrap" an issue for appeal through the co-defendant's objection). Furthermore, when the circuit court indicated it considered informing the jury that it should only consider any medical malpractice committed by Nurse Embrey, Turner indicated he did not want the circuit court to do so.

both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or lack thereof." *Fowler v. Nationwide Mut. Fire Ins. Co.*, 410 S.C. 403, 408, 764 S.E.2d 249, 251 (Ct. App. 2014) (quoting *Fields*, 363 S.C. at 26, 609 S.E.2d at 509).

On appeal, Turner argues the circuit court erred in failing to meet the requirements set forth in *State v. Council*[8] because the circuit court did not find (1) the medical records would assist the trier of fact in determining some fact in issue and (2) the probative value of the medical records was not outweighed by their prejudicial effect in confusing the jury. To the extent Turner argues *Council* requires the circuit court to make such findings, we find Turner misconstrues the holding of *Council* as that case addressed the admissibility of expert testimony regarding scientific evidence. *See Council*, 335 S.C. at 17–24, 515 S.E.2d at 516–20. Thus, we find the circuit court did not abuse its discretion in admitting the medical records.[9]

## IV. Dr. Zile's Testimony

---

[8] 335 S.C. 1, 515 S.E.2d 508 (1999).

[9] Turner also notes the circuit court erroneously admitted subjective opinions contained in the medical records. The record indicates (1) the circuit court admitted the medical records subject to a review of Turner's proposal to redact them, (2) Turner submitted a redacted version of the medical records to the circuit court, and (3) the circuit court ultimately denied Turner's request to redact the medical records. However, neither the record nor Turner's appellate brief indicate which portions of the medical records Turner believed to contain inadmissible subjective opinions. Thus, we find Turner failed to meet his burden of proving the circuit court erred in admitting the medical records. *See Fowler*, 410 S.C. at 408, 764 S.E.2d at 251 ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or lack thereof." (quoting *Fields*, 363 S.C. at 26, 609 S.E.2d at 509)); *see also Goodson v. Am. Bankers Ins. Co. of Fla.*, 295 S.C. 400, 404, 368 S.E.2d 687, 690 (Ct. App. 1988) ("The appellant is responsible for compiling an adequate record from which this court can make an intelligent review.").

Turner argues the circuit court erred in admitting Dr. Zile's testimony regarding (1) Mikell's chances of hospitalization and death and (2) certain medications Mikell stopped taking after the cardiac arrest. We disagree.

## A. Chance of Hospitalization and Death

Turner argues the circuit court erred in admitting and refusing to strike Dr. Zile's testimony regarding Mikell's chances of hospitalization and death. We find this issue is not preserved for our review.

A contemporaneous objection is required to preserve issues for appellate review. *Webb v. CSX Transp., Inc.*, 364 S.C. 639, 657, 615 S.E.2d 440, 450 (2005). "Ordinarily, if an appellant fails to object the first time a statement is made, he or she waives the right to raise the issue on appeal." *Scott v. Porter*, 340 S.C. 158, 167, 530 S.E.2d 389, 393 (Ct. App. 2000). "A motion to strike testimony after it has been admitted without objection is addressed to the sound discretion of the [circuit court]." *McPeters v. Yeargin Constr. Co.,* 290 S.C. 327, 332, 350 S.E.2d 208, 211 (Ct. App. 1986).

At trial, Dr. Zile testified that when he began treating Mikell, Mikell had a fifty percent or greater chance of dying within five years and a fifty percent chance of being hospitalized for recurrent heart failure within any six-month period. Dr. Zile then opined Mikell's chances of dying and hospitalization were exactly the same after his cardiac arrest. Turner did not object to this testimony, and Dr. Zile went on to testify about types of heart failure, the concept of ejection fraction, and Mikell's cardiac history as his patient before again mentioning Mikell's chances of dying were the same after the cardiac arrest as they were when he began treating Mikell. At that point, Turner objected to the testimony and moved to strike it. The circuit court found Dr. Zile should not give opinions about Mikell's chances of survival but denied Turner's motion to strike such testimony. However, because there was no contemporaneous objection to Dr. Zile's initial testimony about Mikell's chances of hospitalization and mortality, we find Turner failed to preserve this issue for appellate review. *See Scott*, 340 S.C. at 167, 530 S.E.2d at 393 ("[I]f an appellant fails to object the first time a statement is made, he or she waives the right to raise the issue on appeal."). Likewise, we find the circuit court did not abuse its discretion in denying Turner's motion to strike Dr. Zile's opinion testimony because the same testimony was already before the jury without objection. *See McPeters*, 290 S.C. at 332, 350 S.E.2d at 211 ("A motion to strike testimony after it has been admitted without objection is addressed to the sound discretion of the [circuit court]."); *id*. (finding the circuit court did not abuse its

discretion when it sustained an objection to a question but refused to strike the witness's previous answers to similar questions).

## B. Discontinuation of Medications

Turner also argues the circuit court erred in allowing Dr. Zile's testimony about whether it was proper for Mikell to discontinue and not restart certain heart medications following his cardiac arrest. We disagree. Dr. Van Bakel also testified about the discontinuation of these medications and about why the medications were not restarted, and Turner did not object to this testimony and does not challenge this testimony on appeal. Therefore, even if admission of Dr. Zile's testimony was error, it was harmless because it was merely cumulative to other evidence. *See Campbell v. Jordan*, 382 S.C. 445, 453, 675 S.E.2d 801, 805 (Ct. App. 2009) ("When improperly admitted evidence is merely cumulative, no prejudice exists, and therefore, the admission is not reversible error."); *see also Taylor v. Medenica*, 324 S.C. 200, 215, 479 S.E.2d 35, 43 (1996) (finding there was no error in admitting testimony about the plaintiff's ineligibility for certain treatment because such testimony was cumulative to other similar testimony); *McGee v. Bruce Hosp. Sys.*, 321 S.C. 340, 345, 468 S.E.2d 633, 636 (1996) (finding even if it was error to allow certain witnesses to testify about the ideal placement of a catheter, such error was harmless because it was merely cumulative to other testimony).

## V. The Blank Mayday Record

Turner argues the circuit court erred in admitting a blank copy of a Mayday record and in allowing a witness to provide testimony about the contents of Mayday records. Specifically, Turner argues the Blank Mayday Record was not relevant and violated the best evidence rule. We disagree.

The admissibility of evidence is within a circuit court's discretion, and absent a showing of clear abuse of that discretion, the circuit court's admission or rejection of evidence is not subject to reversal on appeal. *Haselden*, 341 S.C. at 497, 534 S.E.2d at 301. "An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion is without evidentiary support." *Fields*, 363 S.C. at 26, 609 S.E.2d at 509. "To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or lack thereof." *Fowler*, 410 S.C. at 408, 764 S.E.2d at 251 (quoting *Fields*, 363 S.C. at 26, 609 S.E.2d at 509). "When

improperly admitted evidence is merely cumulative, no prejudice exists, and therefore, the admission is not reversible error." *Campbell*, 382 S.C. at 453, 675 S.E.2d at 805.

## A. Relevance

Rule 401, SCRE provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, "[a]ll relevant evidence is admissible." Rule 402, SCRE.

We disagree with Turner's assertion that the Blank Mayday Record was not relevant. Throughout the case, both parties referenced a Mayday record. Turner specifically attempted to elicit testimony that information regarding why a Mayday code was called could be included in a Mayday record. Thus, the inclusion of a blank version of such a record and testimony regarding what type of information would be included in a Mayday record were relevant to rebutting Turner's assertions and to showing what types of information are typically included in Mayday records.[10] Thus, we find the Blank Mayday Record was relevant.

## B. The Best Evidence Rule

Rule 1002, SCRE provides: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required . . . ."

Turner argues the Blank Mayday Record and Ms. Scarbrough's testimony were used to describe the contents of Mikell's Mayday Record. He avers this violated the best evidence rule because Mikell's actual Mayday record should have been used. Because the Blank Mayday Record and Ms. Scarborough's testimony were used to show the type of information ordinarily contained in any Mayday record, not to indicate what was specifically included in Mikell's Mayday Record, we find the best evidence rule does not apply.

---

[10] On appeal, Turner appears to argue the circuit court improperly admitted the Blank Mayday Record because MUSC only sought to use it to rebut the circuit court's adverse inference instruction. We find this argument is without merit because when the Blank Mayday Record was admitted, the circuit court had not yet decided to administer such an instruction and had specifically indicated it did not plan on giving such a charge at that time.

Furthermore, Turner failed to show any prejudice resulting from the admission of the Blank Mayday Record. *See Fowler*, 410 S.C. at 408, 764 S.E.2d at 251 ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or lack thereof." (quoting *Fields*, 363 S.C. at 26, 609 S.E.2d at 509)). Turner argues he was prejudiced because the admission of the Blank Mayday Record and Ms. Scarbrough's testimony enabled MUSC to counter his attack of MUSC's witness's credibility and the adverse inference permitted under *Stokes v. Spartanburg Regional Medical Center*.[11] However, the record indicates that when the Blank Mayday Record was admitted, the circuit court had not yet decided to administer an adverse inference instruction and had specifically indicated that it did not intend to at that time. Furthermore, Ms. Scarbrough's testimony and the Blank Mayday Record were cumulative to Dr. Guldan's and Dr. Payne's testimony that a mayday record solely documented what took place during the Mayday itself. *See Campbell*, 382 S.C. at 453, 675 S.E.2d at 805 (finding evidence is not prejudicial if it is merely cumulative).

**CONCLUSION**

Based on the foregoing, the findings of the circuit court are

**REVERSED** and **REMANDED** as to the partial directed verdict and **AFFIRMED** as to the remaining issues.

**GEATHERS and HILL, JJ., concur.**

---

[11] 368 S.C. 515, 522, 629 S.E.2d 675, 679 (Ct. App. 2006) (providing for an adverse inference jury charge when there has been spoliation of evidence).